**Lathan DENNIS, Plaintiff–Appellant,**

v.

**COUNTY OF FAIRFAX,**
**Defendant–Appellee.**

No. 94–1689.

United States Court of Appeals,
Fourth Circuit.

Argued April 5, 1995.

Decided May 24, 1995.

**ARGUED:** Solaman G. Lippman, Lippman & Associates, Washington, DC, for appellant. Edward Everett Rose, III, Asst. County Atty., Fairfax, VA, for appellee. **ON BRIEF:** Richard H. Semsker, Lippman & Associates, Washington, DC, for appellant. David P. Bobzien, County Atty., Robert Lyndon Howell, Deputy County Atty., Fairfax, VA, for appellee.

Before ERVIN, Chief Judge, and WILKINSON and WILKINS, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Chief Judge ERVIN and Judge WILKINS joined.

## OPINION

WILKINSON, Circuit Judge:

Lathan Dennis appeals from judgment as a matter of law in favor of his municipal employer on various claims of racial discrimination in the workplace. The district court dismissed Dennis' chief claims because the employer had fully redressed those same grievances through internal procedures. We agree that this prior relief warranted judgment for the employer. Consequently, we affirm.

### I.

The events surrounding this case date back to July of 1989, when the Fairfax County Department of Transportation hired Lathan Dennis, who is black, to serve in its Planning Division as a Planner II. Prior to receiving this offer, Dennis submitted to the County five unsuccessful employment applications. At the time of Dennis' hiring, Gary Erenrich served as Deputy Director of the Department, while Robert Moore headed the Planning Division. Robert Kuhns directed the particular section in which appellant

worked, and Don Ostrander, a Planner III, was appellant's immediate supervisor.

In early 1990, Dennis requested, but did not receive, specialized computer software training. Later that year, Ostrander resigned from the Department, thereby creating a Planner III opening. Dennis indicated to his supervisors that he would like to be promoted to the position. Due to a budget freeze, however, the County never filled the vacancy. Eventually, the Planner III position was eliminated.

In January of 1992, Dennis learned that a white co-worker named Charles Denney had been disparaging his job performance. Dennis requested a meeting with Denney and Kuhns (who had become Dennis' immediate supervisor upon Ostrander's resignation) to discuss the matter. At the meeting, a vociferous argument ensued. Dennis demanded that Denney explain his comments. Denney loudly refused to do so and left the room. As Denney walked down the hall, Dennis followed him, repeatedly demanding an apology. The two rounded the corner of the hall and then stopped in front of Chief Moore's office. Dennis again ordered Denney to apologize but Denney only responded with expletives. Moore, overhearing the fracas, emerged from his office and asked them both to desist. No racial slurs were ever uttered.

Within a matter of days, Moore began to investigate the incident. He interviewed witnesses and also spoke with Dennis. On January 21, 1992, Moore issued a written reprimand to Dennis and an oral reprimand to Denney, both for disorderly conduct. Pursuant to County Personnel Regulations mandated by Virginia Code § 15.1–7.1 (Supp. 1994), Dennis then submitted a grievance claiming that Moore took unequal disciplinary action as between him and Denney. Deputy Erenrich, however, found that Moore had not acted out of any bias in reprimanding the two in different fashions. Erenrich further determined that both men had behaved equally abysmally and thus deserved to be similarly disciplined. Because Denney had received no more than an oral reprimand, Erenrich informed Dennis on February 6, 1992, that the disciplinary memorandum would be permanently withdrawn from Dennis' personnel file.

Nonetheless, Dennis filed a charge with the EEOC in July of 1992 alleging disparate disciplinary treatment with respect to the Denney incident. The EEOC did not find probable cause to believe that the County had discriminated against Dennis, but did issue a right-to-sue letter.

A few months after he filed the EEOC complaint, Dennis received his 1992 performance review from Kuhns. The evaluation qualified Dennis for a raise, even though the ratings in five categories dropped below those he received in 1991. Dennis' overall score, however, was the same as in his 1991 evaluation and in others past. Dennis complained to Kuhns about the five individual ratings, and Kuhns elevated one of them to its 1991 level. Unsatisfied, Dennis filed an internal grievance, alleging that Kuhns had downgraded him in retaliation for filing grievances in connection with the Denney incident. That grievance made its way up the supervisory chain. It finally reached Deputy Erenrich, who agreed to raise the four scores still at issue to their 1991 levels. Thus, when the grievance proceedings terminated, all of appellant's scores were the same as in 1991.

Thereafter, Dennis filed suit against Fairfax County. The November 5, 1993, complaint alleged various incidents of racial discrimination in violation of § 1981 and Title VII. At the close of Dennis' evidence, the district court granted the County's motion for judgment as a matter of law. From that judgment, Dennis appeals.

II.

The primary claims in this case relate to the Denney incident and the 1992 performance evaluation. Specifically, appellant contends that both the disciplinary memorandum and the lower scores that he received were motivated by racial bias. Notwithstanding the fact that the County subsequently modified these actions, appellant maintains that the County should be held liable because he was, in the first instance, a victim of racial discrimination. Indeed, Den-

nis operates from the assumption that the corrective action taken by the County demonstrates that discrimination was initially afoot.

### A.

■ Appellant labors under a misapprehension: namely, that corrective action by an employer amounts to a concession that discrimination actually took place. As a general matter, voluntary remedial acts are no basis for subsequent liability. *See . e.g.,* Fed. R.Evid. 407 (evidence of "subsequent [remedial] measures is not admissible to prove ... culpable conduct"). And relief often issues absent an admission of culpability by the relevant party. Consider, for example, consent judgments. Parties may agree to such decrees and assent to be bound thereby. But in electing such a remedy, they generally admit nothing in the way of guilt. Thus, because "[t]he central characteristic" of a consent decree is "that it does not involve contest or decision on the merits," 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4443 (1981), it generally does *not* bind the parties in any future litigation as an admission of wrongdoing. *Id.*

In fact, if corrective action operated in a court of law as a confession of liability, untoward consequences would result. Employers would have little or no incentive to investigate allegations of discrimination in the workplace. Because investigation might lead to the discovery of possible discrimination, employers would place themselves in a delicate spot: to allow the discriminatory action to stand might result in liability for the employer because it is on notice of the troublesome behavior, *see e.g., Risinger v. Ohio Bureau of Workers' Compensation,* 883 F.2d 475, 483 (6th Cir.1989), but to take corrective action might be to admit full-blown discrimination. Thus, not only would employers lack motivation to investigate complaints of discrimination, but they might actually be better off (in terms of avoiding liability) to affirmatively ignore them.

We cannot imagine that Congress intended the civil rights statutes to have such perverse effects. Congress has expressly called for the implementation of alternative dispute resolution of employment discrimination charges. *See* Civil Rights Act of 1991, Pub.L. No. 102–166, § 118, 105 Stat. 1071, 1081 (codified at 42 U.S.C. § 1981) ("Where appropriate ... the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the [civil rights] Acts...."). Encouraging non-judicial resolution of workplace grievances is thus an important part of the statutory scheme that Congress enacted. And, by providing for a relatively short limitations period, *see* 42 U.S.C. § 2000e–5(e) (180 days to file with EEOC), Title VII appears also to value the prompt resolution of claims. Appellant's suggestion that discrimination be inferred from corrective action runs counter to each of these goals, because it discourages the establishment and use of prompt internal grievance procedures.

Moreover, appellant's argument as to the inculpatory effects of corrective action does not answer the ultimate question in suits alleging employment discrimination: whether the decision of which the plaintiff complains was infected by impermissible bias. *See U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (parties and courts should not "unnecessarily evade[ ] the ultimate question of discrimination *vel non* "). The specifics of this case illustrate the point. The mere fact that the County modified the initial results of the disciplinary action and the performance evaluation does not lead inexorably to the conclusion that those decisions were motivated by race. Indeed, the balance of the facts suggests otherwise. Moore overheard only the last part of the altercation between appellant and Denney— the part that took place outside Moore's office and in which appellant, by his own admission, was yelling the loudest. Moore could thus reasonably have believed that appellant was the more culpable party. As for the performance evaluation, it was completed by Kuhns, who had never before reviewed appellant because Kuhns was a newly-appointed supervisor; appellant's prior evaluation, on the other hand, was done by Ostran-

der. It stands to reason that two supervisors might reach varying results in reviewing an employee, especially when one is new to the task. The existence of any discriminatory motive is especially dubious in light of the fact that the *overall* score Kuhns first gave appellant was equivalent to that of previous years.

### B.

Appellant's view of the legal significance of an employer's corrective action, if accepted, would create a broad disjunction between the law of Title VII and § 1981. The import of corrective action is an issue that has arisen only recently under § 1981. This is due to the fact that prior to the 1991 Civil Rights Act, Pub.L. No. 102–166, 105 Stat. 1071, racial discrimination with respect to general conditions of employment was not actionable under § 1981. *Patterson v. McLean Credit Union,* 491 U.S. 164, 175–82, 109 S.Ct. 2363, 2371–75, 105 L.Ed.2d 132 (1989). The 1991 Act, however, amended § 1981 to expand its coverage to "all benefits, privileges, terms, and conditions" of contractual employment relationships. 42 U.S.C. § 1981(b). Thus, the scope of § 1981 now extends beyond its traditional causes of action for hiring, firing, and promotions, to general conditions of employment, including incidents of racial harassment in the workplace.

The law of sexual harassment under Title VII, however, contains a ready-made theory of employer liability. In *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court rejected a theory of strict liability for employers and instead looked to traditional agency principles to determine when they must pay for the sexual harassment of employees by other employees. *Id.* at 69–73, 2406–08. Expanding upon *Meritor,* this court held that "[t]he employer is liable where it had 'actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action.'" *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (quoting *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983)); *see also Paroline v. Unisys Corp.,* 879 F.2d 100, 106 (4th Cir.1989) (not-

ing that liability cannot be imputed to employer where it takes remedial action "'reasonably calculated to end the harassment'") (quoting *Katz*), vacated and remanded on other grounds, 900 F.2d 27 (1990) (en banc).

The above reasoning applies as well to claims of racial discrimination in the workplace under § 1981. In both cases, the general question is the proper extent of an employer's responsibility for the offensive acts of its employees, an inquiry that implicates principles of agency law. *See Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. The particular type of prejudice that generated the impermissible employee behavior is clearly of little relevance to that question. For reasons of consistency and logic, then, the notice rule for employer liability that governs sexual harassment under Title VII should also control here.

Courts have suggested that the notice liability scheme for sexual harassment also applies to racial harassment. *See White v. Federal Express Corp.,* 939 F.2d 157, 160 (4th Cir.1991) (discussing *Katz*'s notice rule in context of claim alleging racially hostile work environment); *Friend v. Leidinger,* 588 F.2d 61, 67 (4th Cir.1978) (city fire bureau not liable for alleged incidents of racial discrimination where bureau "had taken corrective action against white officers and employees who had harassed or discriminated against blacks," and had not "participated in or condoned" any of the incidents); *see also Risinger,* 883 F.2d at 481–83; *Snell v. Suffolk County,* 782 F.2d 1094, 1103–04 (2d Cir. 1986); *De Grace v. Rumsfeld,* 614 F.2d 796, 804–05 (1st Cir.1980). In fact, the Eighth Circuit recently relied on *Katz* in a racial harassment case to hold that an employer is "liable only for events of which it knows or should have known ... and with respect to which it fails to take corrective action." *Jeffries v. Metro–Mark, Inc.,* 45 F.3d 258, 259 (8th Cir.1995).

Appellant's contention that corrective action cannot protect an employer from liability is thus in error. It would set a standard that flatly contravenes the Title VII regime of employer liability for sexual harassment, now also taking root in racial

harassment cases. Drawing upon that settled law, we conclude that where an employer implements timely and adequate corrective measures after harassing conduct has come to its attention, vicarious liability should be barred regardless of the specific motivation for the wrongdoing or the particular cause of action.

## C.

■ Finally, appellant argues that the results of the internal grievance procedures in this case do not preclude his claims under *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). He contends that because unreviewed state administrative proceedings are not res judicata in federal court, *id.* at 795–96, 106 S.Ct. at 3224–25, neither are the internal grievance proceedings at issue here.

This is simply not a case about the preclusive effect of an administrative proceeding. It is, as discussed above, a case about the scope of employer liability and the legal ramifications of a party's own corrective actions. Where an employer has taken prompt and effective corrective measures to redress alleged incidents of racial harassment, the employer is not liable because its final act was not of a discriminatory nature. It is the complainant's consequent lack of injury-in-fact, not preclusion doctrine, that bars judicial redress. Here, because the County removed appellant's disciplinary memo from his personnel file within two weeks and raised his scores to their prior level without undue delay, it was entitled to judgment as a matter of law.

## III.

Appellant also alleges the more traditional claims of discrimination in hiring, promotion, and training. He asserts that due to his race, the County refused to hire him the first several times he applied for employment, denied him a promotion to Planner III status, and failed to grant his request for computer training. The district court properly dismissed these claims as well.

■ To the extent that these claims were pleaded under § 1981, they run afoul of *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). *Jett* held that when suit is brought against a state actor, § 1983 is the "exclusive federal remedy for violation of the rights guaranteed in § 1981." *Id.* at 733, 109 S.Ct. at 2722. Thus, the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities. *Id.* at 735–36, 109 S.Ct. at 2722–23.[1] Appellant named the Fairfax County Department of Transportation as the defendant, yet there has been no allegation—much less a showing of proof—that the supposedly discriminatory decisions on his hiring, training, or promotion were pursuant to official County custom or policy. In fact, the County has a clear policy against discrimination. *See* Fairfax County Code § 3–1–21(d) (1976).

■ Similarly foreclosed are any Title VII elements of appellant's hiring, promotion, and training claims. Although appellant registered a complaint with the EEOC, he has nevertheless failed to exhaust his administrative remedies. *See* 42 U.S.C. § 2000e–5(b). The EEOC complaint did not address any question of discrimination in hiring, training, or promotion. Where, as here, the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.

---

1. We do not believe that this aspect of *Jett* was affected by the Civil Rights Act of 1991, which added subsection (c) to § 1981. *See* 42 U.S.C. § 1981(c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."). Some district courts have asserted, largely without explanation, to the contrary. *See Robinson v. Town of Colonie*, 878 F.Supp. 387 (N.D.N.Y.1995); *LaCompania Ocho,* *Inc. v. U.S. Forest Serv.*, 874 F.Supp. 1242 (D.N.M.1995). We think the correct reading of the amendment is found in *Philippeaux v. North Central Bronx Hosp.*, 871 F.Supp. 640 (S.D.N.Y. 1994), which recognizes that subsection (c) did not purport to overrule *Jett's* holding with respect to municipal liability but only to codify *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).

*EEOC v. General Electric Co.,* 532 F.2d 359, 366 (4th Cir.1976).[2]

### IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

2. Finally, we find no merit to appellant's various challenges to the district court's evidentiary rul-

