Andrea NELSON, Plaintiff,

v.

**WATERGATE AT LANDMARK,**
**Defendant.**

Civ. A. No. 95–72–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 29, 1995.

Sol Z. Rosen, Washington, DC, for Plaintiff.

Mary Lynn Reed, Scott A. Mills, William F. Causey, Jackson & Campbell, P.C., Washington, DC, for Defendant.

### *MEMORANDUM OPINION*

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on the defendant's Motion for Judgment as a Matter of Law following this Court's entry of judg-

ment for the plaintiff after trial on August 21–22, 1995, at which time the jury returned a verdict for the plaintiff. Also before the Court are plaintiff's Motion for Equitable Relief and Motion for Attorney's Fees. Examining the facts in the light most favorable to the plaintiff, the Court nevertheless concludes that the plaintiff has not proven that her employer had notice of a racially hostile environment and that therefore she cannot recover under Title VII or 42 U.S.C. § 1981. The Court now denies plaintiff's motions, grants defendant's motion, vacates its earlier judgment and enters judgment for defendant as a matter of law pursuant to Federal Rule of Civil Procedure 50.

## I. Background.

### A. *Procedural history.*

Plaintiff Andrea Nelson sued defendant Watergate at Landmark ("Watergate") on three counts: Count I, racial discrimination in violation of Title VII, 42 U.S.C. § 2000e–2; Count II, racial discrimination in violation of 42 U.S.C. § 1981; and Count III, retaliatory discharge in violation of U.S.C. § 2000e–3(a). At trial, Nelson proceeded on two theories of the case: racially hostile work environment and retaliatory discharge. After a two day trial on August 21–22, 1995, the jury returned a verdict for Nelson on Counts I and II but found for Watergate on Count III. The jury awarded Nelson $4000 in compensatory damages and no punitive damages.

Watergate made its motion for judgment as a matter of law at the close of plaintiff's evidence and again after trial, in timely fashion. The parties have each filed briefs on the issue, and at the Court's request filed supplemental memoranda on the specific issue of whether Nelson provided sufficient notice to her employer that a racially hostile environment existed. Plaintiff has filed motions for attorney's fees and for equitable relief, in the form of deleting negative references in Nelson's employment file.

### B. *Facts presented at trial.*

The following facts were undisputed at trial: the evidence showed that Watergate hired Nelson in December, 1991, as switchboard operator, a temporary position. When the temporary position ended in February 1992, Watergate hired Nelson as a customer service representative. On March 15 of that year Watergate transferred Nelson to assistant director of activities, and then to a final position as administrative assistant to the Director of Administration, Bob Swain. Watergate indicated its satisfaction with Nelson's work performance and repeatedly increased her responsibilities and her authority. Nelson was given a supervisory role over several employees. Swain continued to be her supervisor throughout this period and until the date of her termination. Nelson several times took issue with perceived slights, such as having her name left off of an employee organizational chart and being an hourly, rather than a salaried employee. When confronted, Watergate agreed to change Nelson's employment to a salaried basis. Nelson was, for much of her employment, the only African–American in Watergate's front office.

By March, 1993, Nelson was viewed as a satisfactory employee and had received no adverse reports in her employment records. Nelson had not received a raise for her increased responsibilities, however, and in April 1993, offered to resign to seek a better paying job elsewhere. Also in April, Nelson sent a memorandum to James Cisco, president of the board of directors at Watergate. The letter complained of low pay and lack of trust, but did not mention discrimination or race, despite the fact that in this very memo Nelson mentions that one of her increased responsibilities was to know Equal Employment Opportunity and affirmative action laws "so that this organization is not caught up in unnecessary law suits." The letter was extraordinary because it went over the head of three levels of supervisors; in fact, Cisco asked Nelson to go through the normal "chain of command" in the future.

Watergate agreed to give Nelson time off as necessary to interview for other positions. However, Nelson began at this time to experience serious difficulties in the office. Over the next several months, Nelson began to have personality conflicts with Kate Green, a lesbian coworker, and with Swain, her supervisor, both caucasian. Watergate manage-

ment learned of Nelson's problems after Nelson sent several typed memorandums to Petrine Squires, General Manager, and to Lana Reynolds, a vice president at Watergate's management company, CMC, Inc. Squires met with Swain and Nelson about the problem, but never completely resolved the issue. Squires continued to investigate but in September, 1993 received a note from Nelson indicating that her problems were "not important," that she "would not be here much longer," and that "making waves at this point is not necessary. Everything is okay with me." During these meetings and in her notes to Squires, Nelson never claimed to have been discriminated against based on her race.

The "okay" note was premature, as Nelson did not secure another job and continued to experience problems. The parties began to pursue a policy of putting all their correspondence in writing, and a flood of memoranda followed. Nelson several times sent memos to James Cisco, president of Watergate's board of directors. Most significantly, in February 1994, Nelson attempted to summarize her problems with Swain. In her nine-page typed memo, Nelson mentioned meeting with representatives from the NAACP, mentioned reading a book called "The Black Manager" and claimed Swain "humiliated me, discriminated against me," but she did not state that she alleged a racially hostile environment or race discrimination. Sexually-tinged conversations were more prominently featured, and the issue of Green's lesbianism was also raised.

Squires' responding memo made it clear that Watergate thought Nelson was alleging sexual harassment, and requested Nelson to elaborate, give dates and descriptions of incidents, and explain any "other discrimination." Squires also explained that she thought Nelson had a duty, in Nelson's supervisory role, to expose any discrimination and to help Watergate correct a problem if one existed. However, Nelson flatly refused to cooperate or discuss the matter on the grounds that "no charges have been made." As a result, Watergate retained the law firm of Hazel & Thomas to investigate sexual

harassment or a sexually hostile work environment.

After a two-day on-site investigation which included an hour-long meeting with Nelson, the Hazel & Thomas attorney concluded that no such harassment or environment existed. In her meeting with the attorney, Nelson did not allege being the victim of harassment herself, nor did she allege a sexually hostile environment. Nelson did allege that someone had once made a racial comment to a coworker, Paula Waters, but not to Nelson. Nelson made no claim of racial discrimination or discrimination of any type, though the attorney admits not investigating racial discrimination and admits that, when Nelson did not pursue the topic, the attorney let the matter drop. Hazel & Thomas, in its final report of March 21, 1994, concluded that there was no evidence of sexual harassment by Swain.

Nelson continued to have problems with Swain after the investigation, and sent more memoranda to Watergate management. In a final undated letter to Cisco, Nelson complained that "my job position is treated differently." She did not mention race.

Nelson admitted at trial that she never directly accused anyone at Watergate of racial harassment, never linked being treated "differently" to her race, and that she only once, in the memorandum to Cisco, even used the word "discriminated." Whether in writing or in the various meetings called to resolve the conflict, Nelson never charged that her problems were the result of racial animus. She instead claimed on at least one occasion that she was being treated "differently." Nelson testified that she used no more direct language because she did not want to "rock the boat," be a "troublemaker," or sound like she was making threats.

## II. Analysis.

A. *The standard for judgment as a matter of law in a jury trial.*

 A district court may grant a motion for judgment as a matter of law against a party after a jury trial, based on a specific issue, only if there is no legally sufficient evidentiary basis for a reasonable jury to have found for the party on that issue. *See*

Fed.R.Civ.P. 50(a); *Brown v. CSX Trans., Inc.,* 18 F.3d 245, 248 (4th Cir.1994). To grant the motion, the district court must examine the motion in the light most favorable to the non-moving party and determine whether a reasonable trier of fact could draw only one conclusion from the evidence. *Id.*

B. *The requirement of notice in a hostile environment case.*

The Supreme Court has rejected a theory of strict liability for employers and instead looks to traditional agency principles to determine when employers must pay for the sexual harassment of employees by other employees. *Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995), *citing Meritor Savings Bank F.S.B. v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The employer is liable where it had actual or constructive knowledge of the existence of a sexually hostile environment and took no prompt and adequate action. *Dennis,* 55 F.3d at 155. This notice principle applies equally to racial discrimination claims under Title VII and 42 U.S.C. § 1981. *Id.; see also Carter v. Ball,* 33 F.3d 450, 461 (4th Cir. 1994); *Jeffries v. Metro–Mark, Inc.,* 45 F.3d 258, 259 (1995). The plaintiff bears the burden of proving employer notice. *Carter,* 33 F.3d at 461, *citing Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405–06.

Notice allows an employer to recognize the problem for what it is and take corrective action. *See Dennis,* 55 F.3d at 156. As the Fourth Circuit in *Dennis,* a racially hostile environment case, held:

we conclude that where an employer implements timely and adequate corrective action after harassing conduct has come to its attention, vicarious liability should be barred regardless ...

*Id.* Thus, notice is crucial because prompt corrective action allows an employer to avoid liability. *Id.*

The remaining question is whether an employee must use specific words to put her employer on notice of her racial discrimination concerns. The Court's research, and apparently that of the parties as evidenced by the thin citation of their supplemental briefs, has disclosed little precedent on the issue. The one helpful case, *Stallcop v. Kaiser Foundation Hospitals,* prevented a plaintiff from claiming "age" and "sex" discrimination because she did not use those specific words. 820 F.2d 1044, 1051 (9th Cir.1987). The plaintiff, Stallcop:

contends that her failure to use the specific words "age" and "sex" should not preclude her action based on sex and age discrimination ... Stallcop contends that she told the DFEH [California Department of Fair Employment and Housing] investigator the totality of her employment problems with Kaiser. However, the charge Stallcop actually filed with the DFEH does not include any allegations of sex or age discrimination. Therefore, DFEH obviously would have investigated only national origin discrimination.

*Id.* The Ninth Circuit then held that the only ripe claim was the national origin complaint mentioned in the filed charge, and dismissed the age and sex complaints for failure to exhaust state administrative remedies. *Id.*

Examining the facts of the case in the light most favorable to Nelson, this Court concludes that Nelson did not prove actual or constructive employer notice.

Nelson concedes, in testimony and memoranda before the court, that she never provided actual notice. She never used words equivalent to "racial animus" or "racial discrimination," or even the word "race." Nelson never directly claimed to anyone in a supervisory position with respect to Swain that she thought her being treated differently was based on her race. Neither did Nelson produce any evidence that this recognition dawned on Watergate management. Without any evidence, no reasonable trier of fact could conclude that Watergate had actual notice.

Thus the case turns on constructive notice, which Nelson also fails to meet. Constructive notice is a question of whether a reasonable employer, in like circumstances, should have known of the environment or should have understood Nelson's claims as race-based. Nelson was the only black in the front office, and her conflicts were with white

employees. She did, in one of her many memoranda, mention the word discrimination and then, in later paragraphs, the fact that she had met with someone from the NAACP. Taken alone, these facts could conceivably require a reasonable employer to investigate for racial hostility. However, Watergate aggressively responded to the "discrimination" memo. Squires made it clear that she had understood the problem to be sexual hostility, from Nelson's complaints about Green and about Swain's arguably sexist remarks. Squires specifically asked Nelson to help expose the problem or find "other discrimination," but Nelson refused. Nelson allowed Watergate to go through the expense of an independent legal investigation of gender bias, and never once corrected management's misunderstanding of the problem. Given these additional facts, no reasonable employer would conclude, from Nelson's actions, that race bias was at work.

Nelson did not merely fail to inform Watergate of the problem, but she also actively, if inadvertently, prevented management from discovering it. Nelson, as Watergate well knew, was a strong, outspoken personality and beyond that had expertise in equal employment law. She was not one to shrink from controversy; in fact, she was willing to repeatedly bypass normal channels and take her complaints directly to Cisco, even after he asked her to instead follow the chain of command. A reasonable employer could not predict that such an outspoken employee, well-versed in civil rights regulations, would deliberately avoid civil rights law language out of a sudden fear of being perceived as a "troublemaker." This Court need not rigidly adopt a requirement of specific words, as in *Stallcop*. However, it is instructive that even a state EEO agency, whose very business is civil rights complaints, is not required to detect a claim based on a status where that claim and status is not mentioned by name. On the facts of the present case, there are simply too many dimensions to the word "differently" for a claimant to leave the interpretation of that word to chance.

The Civil Rights Acts are meant to protect plaintiffs from discrimination, but under Fourth Circuit law they also protect employers from surprise suits. The Acts are powerful tools, but the law directs that an employee must use them: she must notify the employer of a problem, so that the employer can help her by taking corrective action, if properly inclined. Without requiring such notice, this Court would render the corrective action alternative meaningless. That result would be especially unfair in this case, where Watergate took immediate, decisive action to investigate the gender charges it believed Nelson to have made.

In summary, this Court does not attempt to disturb the jury's belief that Swain or Green created a racially hostile environment which harmed the plaintiff. However, no reasonable trier of fact could have concluded that Nelson put Watergate on actual or constructive notice of that environment. The Court's conclusion would be the same even if the burden of proving no notice were, contrary to precedent, placed on the defendant. Therefore Nelson cannot recover under Counts I or II, and because the jury found for the defendant on Count III, retaliatory discharge, Watergate is entitled to judgment as a matter of law.

### III. Conclusion.

Examining the facts in the light most favorable to the plaintiff, the Court finds that there is no legally sufficient evidentiary basis for the jury to have found that defendant Watergate at Landmark had actual or constructive notice of a racially hostile environment. A reasonable trier of fact could draw only one conclusion from the evidence: that Watergate was without notice. Therefore plaintiff Nelson cannot recover under Title VII or § 1981 for racial discrimination. Because the jury found for defendant on the remaining issue, retaliatory discharge, this Court now denies plaintiff's motions for equitable relief and for attorney's fees, grants defendant's motion, vacates its earlier judgment and enters judgment for the defendant as a matter of law.