**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EVELYN L. SANDERS,
Plaintiff-Appellant,

v.

No. 95-2495

BETHLEHEM STEEL CORPORATION;
UNITED STEELWORKERS OF AMERICA,
Local 2609,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
John R. Hargrove, Senior District Judge.
(CA-93-4113-HAR)

Argued: April 3, 1996

Decided: June 28, 1996

Before RUSSELL, HALL, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Nevett Steele, Jr., NEVETT STEELE, JR., P.A., Towson,
Maryland, for Appellant. G. Stewart Webb, Jr., VENABLE, BAET-
JER & HOWARD, L.L.P., Baltimore, Maryland, for Appellee Bethle-
hem Steel; Rudolph L. Milasich, Jr., Assistant General Counsel,
UNITED STEELWORKERS OF AMERICA, Pittsburgh, Pennsylva-
nia, for Appellee Steelworkers. **ON BRIEF:** Linda E. Percy,

Timonium, Maryland, for Appellant. Valerie Floyd Portner, VEN-
ABLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for
Appellee Bethlehem Steel.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Evelyn Sanders appeals a summary judgment entered for the defen-
dants, her employer and union, in Sanders' Title VII gender discrimi-
nation suit. We affirm.

I.

Evelyn Sanders has worked for Bethlehem Steel at its Sparrows
Point, Maryland, plant since 1953.[1] She is represented by Local 2609
of the United Steelworkers of America (USWA), and she currently
works in the Tin Mill Metallurgical Lab.

Under a 1974 consent decree aimed at eliminating discrimination
based on gender and race in the steel industry, eligibility for promo-
tions and protection against layoffs were based on plant seniority.
Jobs were classified by pay level, and, within each pay level, the jobs
were ranked. At the Lab where Sanders worked, the top Class 10
position was Sample Expeditor, the second was Lab Equipment
Repairman, and the lowest was Lab (Tensile) Tester.

"Incumbency" was the only way to beat strict seniority. Vacancies
were posted, and employees were free to bid on them. If the most
senior eligible person did not bid, someone with less seniority could

_____

[1] Her "continuous plant service date" is February 21, 1956. According
to her EEOC charge, she did not work for a time because of a pregnancy.

2

vault over him. The higher incumbency would then protect the less senior employee in the event of layoffs, because layoffs began with the most junior person in the highest affected position, who bumped downward.

In about 1985, economic conditions had caused the Lab's Class 10 employees to dwindle to so few that the company and union thought it pointless to maintain a hierarchy within Class 10. The jobs substantially overlapped anyway, and it was growing difficult to provide full-time work to employees who performed only one function. The company and union agreed that Class 10 was a single block of jobs, and promotion into and layoff from Class 10 would be based strictly on seniority. No written memorialization of this agreement was made, and the formal job titles were retained, but the existence of the agreement itself is not disputed. Sanders was in Class 8 at this time, so the change did not concern her. Likewise, she has not alleged that the change had a discriminatory purpose or effect at the time it was adopted.

In 1988, a Class 10 job was posted. Sanders learned of the existence of the block at that time, if not before, because the particular Class 10 job offered was not mentioned in the posting. She complained to her shop steward, Joseph Moose, that the Lab postings and work schedules were not using the separate Class 10 jobs. Sanders did not get the job at that time.

In 1990, Sanders finally had the seniority to win a Class 10 job. In accordance with the informal agreement, the posting did not list the particular job title available, and Sanders had no idea what that title was when she bid on it. It turned out that the job was Sample Expeditor -- formerly the top job -- and Sanders therefore deemed herself the top dog. Despite her formal title, though, she usually was scheduled to work as a Lab (Tensile) Tester, formerly the "lowest" Class 10 job.

All went well until October 1991, when a shortage of work caused temporary layoffs. Both Sanders and a male, William Early, were bumped down to lesser jobs for a short time.

Early complained to Moose. Moose filed a grievance for Early; the gravamen of that grievance was that there was not actually a lack of

3

Class 10 work. When Early's grievance reached stage 3, it was written up and sought back pay for "all affected employees," i.e. including Sanders. Early's grievance was not successful.

Meanwhile, at around the same time Moose filed Early's grievance, Sanders requested that one be filed for her. Moose refused.

Sanders soon had a flurry of actions pending in several different fora. She complained to the Civil Rights Division of the Steelworkers' Union, which secured a letter from David Fyhr of the company offering to investigate and settle her claim for any lost wages. Sanders refused any settlement.

Sanders filed charges with the National Labor Relations Board and Equal Employment Opportunity Commission (EEOC), both to no avail. She was successful, though, when she submitted her dispute to the Bethlehem/USWA Audit Review Committee (BARC). BARC was formed to monitor civil rights compliance upon the expiration of the consent decree in 1989. BARC decided that the 1985 oral agreement was not properly formalized, and Sanders should therefore be made whole for the times she was bumped below Class 10. The grand total of her loss was $253.18. The company deposited this sum in Sanders' account electronically. Sanders then wrote a check to the company for the same amount. The check has not been cashed.

On December 1, 1993, the company and union formally reorganized the Lab line-of-progression in a fashion roughly like that under the 1985 oral agreement, and it submitted the new structure to BARC. Several months later, BARC approved the new plan.

Meanwhile, on December 20, 1993, Sanders filed this suit against the union and company, alleging that the union and company had "demoted" her on account of her gender, the union had refused to represent her on account of her gender, and the new line-of-progression had a similar purpose.

After discovery, the district court granted summary judgment for the defendants. Sanders appeals.

4

II.

Claims of discrimination not included in an EEOC charge are not tenable in court. <u>Dennis v. County of Fairfax</u>, 55 F.3d 151, 156 (4th Cir. 1995). Sanders attempts to include a claim that the company and union discriminated against her on the basis of gender by implementing the new line of progression. This claim is not only not in her EEOC charge; it arose <u>after</u> she had her right-to sue letter.**2** In no sense can it be deemed to be properly exhausted.

The EEOC charge against the union consisted solely of an allegation that the union failed to represent Sanders by refusing to file her grievance. In her complaint, she attempts to also accuse the union of taking part in her alleged "demotion." On the face of things, the latter claim is not properly exhausted.

Sanders argues that she is unsophisticated, she relied on the EEOC to draft the charges, and the EEOC inexplicably split up what she felt was a single charge. There are problems with her argument. She read and signed each charge after it was prepared. Though she is not extensively educated, she is not illiterate, and there is nothing complex about her charges. <u>Cf. Alvarado v. Board of Trustees</u>, 848 F.2d 457 (4th Cir. 1988) ("hypertechnical" error in naming of proper legal entity as respondent was excused where claimant was unrepresented and could not speak English and where proper party had full notice of charge). Finally, the division of the charges by the EEOC was quite logical: the company obviously had nothing to do with her attempt to file a grievance, and unions ordinarily do not promote or demote anyone.

We agree with the district court that Sanders' claims must be limited to those expressly stated in the EEOC charge.

_____

**2** The EEOC charges were dismissed on September 21 and 23, 1993. The new line of progression was proposed by the company and union on December 1, 1993, and was implemented upon BARC's approval on April 22, 1994.

III.

There is no evidence that Bethlehem discriminated against Sanders on the basis of gender. It wrongly bumped her on a few occasions, but its error was clearly the result of its reliance on the oral agreement with the union to treat all Class 10 jobs as a block. It tendered full back pay to Sanders.

IV.

Sanders' claim that the union wrongfully refused to file her grievance presents a closer question. If her affidavit is true, Moose specifically refused to file the grievance because, if it were successful, he would have a "broad over top of" him. Sanders buttressed this allegation with scattered similar comments she had endured through the years by Moose and other male coworkers.

The district court noted this direct evidence of discrimination, but it granted summary judgment because the union would have made the same decision notwithstanding Moose's animus against"broads." Price Waterhouse v. Hopkins, 490 U.S. 228, 242 (1989). Because Early's grievance, if successful, would have given Sanders relief, the union would not have filed a duplicative grievance for Sanders.

This reasoning does not quite suffice. Sanders' grievance was not wholly duplicative. To be sure, Early's grievance would have given her the same result, but not for the same reason. Early just complained that the company was using a sham slowdown in available work to knock everyone down a few notches in pay, and he lost on this contention. Sanders' attack went further: even if someone should have been bumped from Class 10, it should not have been her. Moreover, BARC eventually held that she was absolutely right.

We nonetheless affirm. At her deposition, Sanders remembered only that, in refusing to file her grievance, Moose spoke in a surly tone. When specifically asked what evidence she had of the union's motivation, Sanders testified:

> [Moose] spoke to me very nastily about refusing me a grievance. I was the first one to be placed out into a Job Class

6

8, and I was very concerned over the progressive ladder. And when Mr. Moose spoke to me, he quoted, he said to me, I know the book and you don't. And he quoted to me, he said -- think of how I want to say it -- it's my way, he said, I'm telling you you don't have a grievance and you take my word for it. And he told me that very nastily, which I didn't think was becoming to a shop steward.

* * *

Mr. Moose looked out for himself because he never had taken the line of progression. And when I spoke of it, I said, when it comes down to jobs, he was on a 10 and everybody that had gone through the line of progression wasn't a 10. But Mr. Moose was, and he never went through the pickler, and he never took any of the line of progression. To me, he was looking out for himself. And when I questioned him, he became very belligerent and very nasty.

This testimony all but conceded away Sanders' claim against the union. Title VII does not prohibit "nasty" or self-interested conduct by union shop stewards; it prohibits gender discrimination.

When the union moved for summary judgment, citing the dearth of evidence of discrimination, Sanders filed an affidavit in which she remembered, "In 1991, on one of the occasions when I asked for a grievance, Joseph Moose stated to me: `Look, broad, I told you you don't have a grievance. You're not getting a grievance. There won't be a broad over top of me.'" Ordinarily, a party cannot create a genuine issue of material fact by contradicting herself. Barwick v. Celotex Corp., 736 F.2d 946 (4th Cir. 1984). Because it decided the case on other grounds, the district court assumed without deciding that Barwick did not bar consideration of Sanders' affidavit.

Were the critical material fact different, Sanders' affidavit might not run afoul of the Barwick rule. One can certainly use the term "broad" in a "nasty" way, and, if nastiness were the issue, Sanders' affidavit might just add a colorful, and wholly consistent, detail. Here, though, whether Moose's alleged gender-based animus toward Sanders prompted him to refuse her grievance is the key issue, and his con-

7

descending and contemporaneous use of the term "broad" would be much more than a mere detail. Sanders' failure to remember it when repeatedly asked for the bases of her claim is tantamount to testimony that it did not occur. We apply the Barwick rule here, and we disregard the conflicting portion of Sanders' belated affidavit. Without that affidavit, there is simply not enough evidence for a rational trier of fact to find that Moose, the union's decisionmaker, [3] refused to file Sanders' grievance on account of her gender.

The judgment of the district court is affirmed.

AFFIRMED

_____

[3] Sanders' evidence of sporadic hostility toward "broads" from her coworkers has little relevance here. In a "hostile workplace" case, such evidence is often useful, but where, as here, a discrete employment decision is the basis of a discrimination claim, the intent of the decisionmaker is the only issue. Ambush v. Montgomery County Gov't Dep't of Finance Div'n of Revenue, 620 F.2d 1048, 1054-1055 (4th Cir. 1980).

8