Penelope H. MILLS, Plaintiff,

v.

BROWN & WOOD, INC., and James Carroll Jones, individually and as Agent of Brown & Wood, Inc., Defendants.

No. 4:95–CV–32–BO1.

United States District Court, E.D. North Carolina, Eastern Division.

Sept. 26, 1996.

Jeffery B. Foster, Tina L. Fisher, Greenville, NC, for plaintiff.

Timothy C. Barber, Myron T. Hill, Jr., Greenville, NC, for defendants.

## *ORDER*

TERRENCE WILLIAM BOYLE, District Judge.

This matter comes before the Court on Defendant Brown and Wood, Inc.'s motion for summary judgment. Plaintiff filed this action on March 31, 1995, alleging sexual harassment under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.), intentional infliction of emotional distress, negligent hiring and retention, and negligent infliction of emotional distress.

On October 12, 1995, this Court entered an Order dismissing, WITH PREJUDICE, the following: all of Plaintiff's claims against Defendant Jones pursuant to Rules 12(b)(2), (4) and (5) of the Federal Rules of Civil Procedure, and Plaintiff's second claim for relief, that of intentional infliction of emotional distress, against Defendant Brown and Wood, Inc., pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant Brown and Wood, Inc. has now filed a motion to dismiss Plaintiff's First, Third, and Fourth Claims for Relief under Rule 56(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, Defendant's motion is granted.

### I. Statement of the Case

In June of 1992, Plaintiff, Penelope Mills (hereinafter, "Mills"), was hired as a Parts Department inventory clerk by Defendant Brown & Wood, Inc. (hereinafter, "Brown & Wood"), a car dealership located in Green-

ville, North Carolina. Bill Brown is the President and Co–General Manager of Brown & Wood, and his brother, Bob, is General Sales Manager. Plaintiff's supervisor throughout the course of her employment was James Carroll Jones (hereinafter, "Jones"), the Parts Department Manager.

Shortly after being hired, Mills was given an employee handbook on "existing policies, procedures, [and] practices of employment" at Brown & Wood, and on June 17, 1992, Mills signed a form which stated that "I have received, read, and understand the information outlined in this booklet, have asked any questions I may have concerning its contents and will comply with all policies and procedures to the best of my ability to do so." (Defendant's Exhibit B). The employee handbook contained information concerning Brown & Wood's policy on sexual harassment, which was as follows:

HARASSMENT—It is the policy of Brown & Wood, Inc. to provide, have and maintain a working environment free of harassment of any kind. Furthermore, employees have a right to work in an environment free of harassment whether racial, sexual, or otherwise. Harassment may be verbal or physical. All supervisory personnel are and will be reminded of their responsibilities in this area. Supervisors are instructed to take swift, appropriate, remedial action in response to any report or indication of abuse, threats, intimidation or harassment (sexual, physical or otherwise) directed toward any employee. If any employee feels he is being harassed or mistreated in any way, he should report it immediately to:

Mr. Bill Brown
or
Mr. Bob Brown
Brown & Wood, Inc.
329 Greenville Boulevard 27834
(919) 355–6080

All reports will be handled in a prompt, appropriate and confidential manner. Discrimination and harassment will result in appropriate disciplinary action which could include dismissal. (Defendant's Exhibit D).

Mills admits that she received, and that she "reviewed," the employee handbook, and so this fact is not in dispute. (Mills Deposition, p. 182)

In mid-December of 1992, Mills began receiving love notes and cards from Jones, her immediate supervisor. Mills also claims that "Jones would attempt to hug and kiss Mills, and invite Mills to lunch," and that "Jones would use profane language around Mills and discuss private sexual matters with Mills, all of which made Mills very uncomfortable.... Mills informed [Jones] that such language and conversations made her uncomfortable." (Complaint, ¶¶ 11–14). According to Mills, Jones continued to behave in this manner throughout the course of 1993. At no time during the first nine months of 1993 did Mills notify either Bill or Bob Brown, the co-managers of Brown & Wood, of the manner in which Jones was behaving towards her. According to Mills, the reason she did not notify them was because Mills had never "received any reinforcement from any of the other females at Brown & Wood that I had spoken with that the Browns would ever believe personnel over management personnel." (Mill's Deposition, p. 74).

In October of 1993, there was one particular exchange between Mills and Jones which prompted Mills to finally approach Bill Brown, co-manager of Brown & Wood, concerning Jones' behavior. The incident took place at a drinking fountain. Mills was getting a drink of water, and Jones walked by and asked Mills how she was doing. Mills said she was doing fine, and asked Jones how he was doing. "I'm doing just [f——ing] fine," said Jones, with much hostility, and then he kept on walking. (Mills Deposition, p. 74–5). At the end of that work day, as Mills "clocked" out, she saw Bill Brown talking with his mother. Mills waited until the two of them were finished speaking, and then asked Bill Brown if she could speak with him. Bill Brown said, yes, she could, and Mills told him what Jones had said while she was at the drinking fountain, and that it bothered her. Mills did not tell Bill Brown that she had been receiving love notes and cards from Jones, or that Jones had been attempting to hug and kiss her, or that Jones had been

discussing sexual matters with her. Rather, by Mills' own admission, she merely told Bill Brown "of that one particular instance [at the drinking fountain]." (Mill's Deposition, p. 75).

When Mills arrived at work the next morning, Jones allegedly told Mills that "you ... [f——ed up] when you went to Bill Brown about what I said to you at the water fountain yesterday." (Mills Deposition, p. 67) According to Mills, Jones told her that Bill Brown, the previous evening, had instructed Jones, "if necessary, [to] kick [Mills] in the butt, but not too hard, to straighten out the problem." Plaintiff claims that Jones, pursuant to Bill Brown's instructions, did in fact kick her in the buttocks later that day.

Throughout the next few months, Mills claims that Jones continued to behave in the same manner in which he had allegedly been behaving since December of 1992. On March 30, 1994, what is known in the Record as the "warehouse incident" occurred. Apparently, Mills and Jones were working together in a warehouse. Mills claims that Jones knew that Mills' husband intended to visit Mills at work that day, and so Jones locked the doors to the warehouse, presumably to prevent Mills' husband from entering. Mills forthrightly acknowledges that when Mills and Jones were alone in the warehouse, "[a]t no time ... did Jones make any sexual advances to Mills ..." (Plaintiff's Memorandum In Response To Defendant's Motion For Summary Judgment, p. 5). Nevertheless, when Mills' husband discovered that the door to the warehouse in which his wife and Jones were working alone was locked, he became enraged, and Mills' husband called Bill Brown and told him that if Jones "laid a hand on his wife, he [Mills' husband] would kill him [Jones]." (Id.) The next morning, on March 31, 1994, Mills, unable to further tolerate Jones' alleged behavior, quit her job at Brown & Wood and informed Bill and Bob Brown of the precise manner in which Jones had been harassing her, allegedly, for approximately the last 15 months. The following day, Bob Brown called Mills and asked her if she would come back to work for Brown & Wood, explaining that while Jones would still be her supervisor, Jones now understood that his behavior over the course of the past 15 months had been inappropriate. Mills politely declined. During the next two or three days, Bill and Bob Brown investigated Mills' allegations against Jones by interviewing Jones and a number of employees at Brown & Wood. On April 7, 1994, Jones decided to resign.

On May 27, 1994, Mills filed a charge of discrimination with the Equal Employment Opportunity Commission (hereafter, "EEOC"), and on January 27, 1995, the EEOC issued Mills a Notice of Right to Sue. On March 31, 1995, Mills exercised her right to sue and filed this action.

## II. Discussion

Summary judgment shall be granted when, viewing the facts in the light most favorable to the nonmoving party, (1) there is no genuine issue of material fact, and (2) the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. Rule 56(c). The party bearing the burden of proof on an issue at trial must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citation omitted). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Sexual Harassment Under Title VII

Before addressing Plaintiff's first cause of action—sexual harassment under Title VII—it must be emphasized that the man who allegedly harassed Plaintiff for 15 months, Jones, is not the defendant in this case. Rather, it is Jones' employer at the time of the alleged harassment, Brown & Wood, who is the defendant. And so in determining whether Plaintiff's claim under Title VII survives Defendant's motion for summary judgment, this Court must first determine when, under Title VII, an employer is liable for a supervisor's alleged sexual harassment of a subordinate.

■ There are two different types of actionable sexual harassment under Title VII, and they must be distinguished at the outset. First, there is what is known as

*"quid pro quo"* sexual harassment, which refers to the situation in which an employer exercises his or her authority to dismiss, or to promote, or to transfer an employee, as a means of compelling the employee to do something he or she would otherwise not do. The second type of actionable sexual harassment under Title VII is known as "hostile environment" sexual harassment, which refers to the situation in which an employer harasses an employee on the basis of his or her sex, and the harassment is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Plaintiff in the instant case explicitly alleges only "hostile work environment" harassment, (Complaint, ¶¶ 16–19), and since nothing in the Record implicitly suggests *"quid pro quo"* sexual harassment, this Court will analyze the employer's liability only under the "hostile work environment" theory.

An analysis of employer liability under Title VII must begin with the Supreme Court's decision in *Meritor,* in which the Court, applying traditional agency principles to the "hostile work environment" context, held that even though Title VII defines *employer* to include *any agent* of the employer, (See 42 U.S.C. § 2000e(b)), "the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors." *Meritor,* at 72, 106 S.Ct. at 2408. While the Court in *Meritor* "declin[ed] the parties' invitation to issue a definitive rule on employer liability [under Title VII]," *Id.,* the Court did note that "Congress wanted courts to look to agency principles for guidance." *Id.*

■ If a plaintiff alleges hostile environment sexual harassment on the part of a supervisor, and seeks to hold the employer liable under the theory of *respondeat superior,* it is perfectly consistent with the Supreme Court's decision in *Meritor,* and with traditional agency principles, to require the plaintiff to show that the supervisor was acting within the scope of his or her delegated authority at the time of the alleged harassment.

■ Here, Defendant did not entrust Jones, Plaintiff's supervisor, with the authority to send Plaintiff love notes, or to hug Plaintiff, or to discuss sexual matters with Plaintiff. Jones' alleged behavior was clearly outside the scope of his delegated authority. Plaintiff offers evidence of only one incident in which Jones, allegedly acting *within* the scope of his authority, supposedly discriminated against Plaintiff on the basis of her sex. The incident to which we refer is the alleged kick-in-the-buttocks; to wit, that Jones, pursuant to instructions from his boss, Bill Brown, kicked Plaintiff in the behind. There are two fatal problems with this allegation: first, it is inadmissible hearsay, since the only evidence Plaintiff intends to introduce to prove that Bill Brown told Jones to kick her "in the butt," is *Plaintiff's testimony* that Jones told Plaintiff that Bill Brown told Jones to do so. A plaintiff can not rely on inadmissible evidence to survive a motion for summary judgment. *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall ... set forth such facts as would be admissible in evidence"). The second reason why the kick-in-the-buttocks episode, even if provable by admissible evidence, is immaterial, is that Plaintiff offers no evidence to show that Bill Brown instructed Jones to kick Plaintiff *because she was a woman.* A kick in the buttocks, without more, is battery, not sexual harassment.

■ All we have established at this point is that Brown & Wood is not liable, under the principles of agency, for the actions of its supervisor, Jones. But Brown & Wood can still be liable under Title VII for its *own* actions, or, more accurately, for its *failure to act.* As the Fourth Circuit pointed out in *Swentek v. USAIR, Inc.,* an employer can be held liable for "hostile workplace" harassment if the employer "had 'actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action.' In establishing the employer's knowledge, the plaintiff may show that 'complaints about the harassment were lodged with the employer or that the harassment was so per-

908

vasive that employer awareness may be inferred.'" *Swentek*, 830 F.2d 552, 558 (4th Cir.1987) (quoting *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir.1983)); *See also Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir.1995) (applying *Swentek* standard of employer liability to discrimination based on race under § 1981).

■ In paragraphs seventeen through twenty of her Complaint, Plaintiff alleges that Defendant Brown & Wood had *actual notice* that Jones was sexually harassing plaintiff, and that Brown & Wood, rather than remedying the situation, instructed Jones to kick Plaintiff in the buttocks. The Complaint reads as follows:

¶ 17. In November of 1993, Mills felt so harassed and uncomfortable in her working environment that she approached the co-owner and manager of the corporation, Mr. Bill Brown, and requested his assistance in remedying the hostile work environment....

¶ 19. Even though Plaintiff Mills informed an owner and member of upper management of Brown & Wood of the sexually harassing and hostile work environment, Defendant Brown & Wood did nothing to remedy the hostile work environment of the company.

¶ 20. Mr. Bill Brown, owner and operator of Brown & Wood dealt with Plaintiff Mills' complaint by instructing Mills' immediate supervisor, Jones, who was primarily responsible for the harassment, to handle the situation by giving Mills a "kick in the butt." (Complaint)

Plaintiff, clearly familiar with various buzz words from the law of employment discrimination, successfully pleaded a cause of action. But as the Record demonstrates, Plaintiff provides no evidence in support of her claims, and thus she fails to survive a motion for summary judgment.

Under questioning by Defendant's counsel, Plaintiff admitted that throughout the course of Jones' 15 months of alleged sexual harassment, the only notice she ever provided to Brown & Wood that she was allegedly being harassed was when she complained to Bill Brown in October, 1993, that Jones, in re-

sponse to Plaintiff's question, "How are you?", responded, "I'm doing just f——ing fine," and kept on walking.

Q: [Ms. Mills], would it be accurate to state that up until the day that you left Brown & Wood, the only time that you made a complaint to Bill Brown or Bob Brown ... about Jones was when you talked with Bill Brown about what you and I had discussed as the water fountain incident?

A: Yes, sir. (Mills Deposition, p. 86).

■ As this Court noted earlier in its discussion of the factual history of this case, when Plaintiff approached Bill Brown and told him about the incident at the drinking fountain, Plaintiff neglected to explain to Bill Brown that Jones, allegedly, had been engaging in a pattern of hostile and abusive behavior throughout the past ten or eleven months. Under Title VII, an employer is not legally obliged to institute an investigation of a supervisor for sexual harassment simply because the employer was aware that a supervisor had said, in a hostile tone of voice, "I'm doing just f——ing fine," when an employee asked how he was doing. *See*, e.g, *Meritor*, at 65–67, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971)) (" 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII").

Brown & Wood was on notice that Jones was rude to an employee who happened to be a woman. This is indisputable. And Brown & Wood was certainly on notice that Jones, at a minimum, was in a bad mood when he lashed out at one of his subordinates. But no rational construction of the phrase, "I'm doing just f——ing fine," would have put Brown & Wood on notice that Plaintiff was the victim of *sexual harassment.* Since Plaintiff will be unable to testify as to Bill Brown's alleged instructions to Jones to kick Plaintiff "in the butt," the only factual dispute is whether or not Bill Brown actually met with Jones and asked him to stop using foul language around his employees, as Bill Brown claims he did. But since Bill Brown wasn't legally obliged, under Title VII, to do

anything at all in response to Plaintiff's complaint, whether or not he admonished Jones is irrelevant.

 Since Brown and Wood did not have *actual notice* of Jones' alleged sexual harassment, Plaintiff, in order to satisfy the *Swentek* standard of employer liability, must show that there is some factual dispute, which, if proven to her advantage, would tend to prove that Brown & Wood had at least *constructive* notice of Jones' behavior. But since Plaintiff's Title VII claim against the defendant employer rests solely on the theory of *actual notice,* Plaintiff does not offer any evidence that the alleged discrimination was so pervasive that Brown & Wood's knowledge of Jones' alleged behavior can be inferred. And there is no evidence of this in the Record. In fact, Plaintiff's own description of her final meeting with Bill and Bob Brown strongly suggests that the two managers of Brown & Wood were genuinely shocked upon learning that Jones had been giving love notes to Plaintiff throughout the course of her employment:

> When Bob Brown walked in and discovered that these written letters and cards were available, he asked could he see them. And I said, yes sir. And Bob began to read them. And he looked at Bill and he said, have you seen these? And Bill said, no. And then at that time only did Bill decide to start reading these. One of the comments made by Bob when he was reading some of this information was, and I needed to write this down so I'll state it as clearly as I can remember it … the statement that was made by Bob Brown when he actually started reading the information was, Damn Bill, if anyone had written these to Reva [Bob's wife], doors wouldn't have stopped me. Hell, walls wouldn't have stopped me. Do you realize we have a potential lawsuit here?

(Mills Deposition, p. 107–108)

It is not clear from Plaintiff's testimony whether she made contemporaneous notes of her final meeting with Bill and Bob Brown, or whether she merely wrote down her recollections of the meeting during the deposition, to make it easier for her to testify. Regardless, Plaintiff's recollection of Bill and Bob Brown's response when she told them about receiving love notes from Jones for 15 months is remarkably detailed, and it appears that her allegations of sexual harassment were a revelation to them, not a reminder of what they already knew. Since there is no evidence in the Record that Jones had ever been accused of sexual harassment during his 11 years of employment at Brown & Wood, or that Brown & Wood had any reason to believe that Jones might have been predisposed to such behavior, it is not surprising that Bill and Bob Brown, upon learning of Jones' alleged behavior, were taken aback.

Plaintiff argues that Bill and Bob Brown are responsible for their own ignorance of Jones' alleged behavior, since Brown & Wood supposedly failed to provide Plaintiff with a reasonable opportunity for airing her grievances. But Plaintiff's claim is unsupported by the Record. Shortly after hiring Plaintiff, Brown & Wood provided her with an employee handbook containing information concerning Brown & Wood's policy against sexual harassment, and insisted that Plaintiff sign a form stating that she had read the booklet. Plaintiff admits that she read the employee handbook and that she was aware of Brown & Wood's explicit policy against sexual harassment, but she blames Brown & Wood for her own failure to notify management of Jones' behavior because she claims that she had been told by other female employees that Brown & Wood would never "believe personnel over management personnel." (Mills Deposition, p. 74). While it may be true that Jones, who had been working in a supervisory position for 11 years, would be inherently more credible than a non-supervisory employee who had been on the job for a year-and-a-half, Plaintiff's fears that her allegations would not be taken seriously are hard to appreciate, since she had ample physical evidence—in the form of love notes and cards—of Jones' inappropriate behavior. Note that Plaintiff does *not* allege that it was common knowledge at Brown & Wood that Bill and Bob Brown had a sordid history of ignoring complaints of sexual harassment on the part of female employees. Plaintiff merely claims that she assumed that an em-

ployee's allegations against her supervisor, as a rule, would not be taken seriously by the co-managers of Brown & Wood, and so she didn't say anything. But Brown & Wood had an explicit policy against sexual harassment, and Bill and Bob Brown, by all indications, were perfectly accessible. Plaintiff's ill-founded assumption that they were unapproachable does not make out a claim under Title VII.

Assuming, solely for purposes of argument, that Jones harassed Plaintiff because of her sex, and that his harassment was sufficiently severe and pervasive to constitute a "hostile or abusive work environment" under *Meritor*, Plaintiff has offered no evidence that the co-managers of Brown and wood, Bill and Bob Brown, knew, or should have known, of Jones' behavior. Further, since Plaintiff has failed to offer any evidence that Brown & Wood's internal procedures for addressing claims of sexual harassment were inadequate, this Court has no alternative but to grant Defendant's motion for summary judgment as to Plaintiff's first cause of action.

### B. Negligent Hiring and Retention

■ There is no disagreement between the parties as to the appropriate legal standard, under North Carolina law, for making out a claim of negligent retention and hiring of an employee. In order for the plaintiff to survive a motion for summary judgment, there must be factual disputes as to the following:

(1) [A] specific negligent act on which the action is founded ... (2) incompetency [of the employee] by inherent unfitness or previous specific acts of negligence, from which incompetence may be inferred; and (3) *either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in "oversight and supervision,"* ...; and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass,* 327 N.C. 587, 398 S.E.2d 460, 462 (1990) (cites omitted) (emphasis in original).

In Footnote 5 of Plaintiff's Memorandum In Response to Defendant's Motion for Summary Judgment, Plaintiff "concedes that no evidence can be forecast as to negligent hiring," and promises to "proceed only on the theory of negligent retention." In proceeding on the theory of negligent retention, Plaintiff points to *one,* single negligent act on the part of the defendant employer—to wit, Brown & Wood's failure to appropriately investigate Jones after learning that Jones said, "I'm doing just f——ing fine," when Plaintiff asked Jones, while getting a drink of water, how he was doing. Since Plaintiff's testimony concerning Bill Brown's alleged instructions to Jones to kick Plaintiff "in the butt" is inadmissible hearsay, and since Bill Brown did not have a legal duty, under North Carolina Law, to conduct an investigation of Jones for sexual harassment after learning that Jones said, "I'm doing just f——ing fine" to a female employee, Plaintiff has offered no evidence that Brown & Wood negligently retained the man who allegedly sexually harassed her. For this reason, defendant's motion to dismiss Plaintiff's second cause of action—negligent retention and hiring—is granted.

### C. Negligent Infliction of Emotional Distress

■ In paragraphs 49 to 50 of her Complaint, Plaintiff alleges "[t]hat Defendant Brown & Wood negligently inflicted emotional distress in not remedying the sexually and hostile work environment when given notification of such by Mills," and "[t]hat Defendant Brown & Wood's failure to remedy such hostile work environment constitutes extreme and outrageous conduct."

As this Court has already discussed at length, Plaintiff offers no evidence that Brown & Wood responded negligently when informed by Plaintiff that Jones said, "I'm doing just f——ing fine," when Plaintiff asked Jones how he was doing. Since Plaintiff fails to present any factual dispute, which, if proven to her advantage, shows that Brown & Wood's actions proximately caused whatever emotional distress she may have suffered, this Court has no alternative but to grant Defendant's motion to dismiss the fourth, and final, cause of action.

### III.

For the foregoing reason, Defendant's motion to dismiss is granted.

SO ORDERED.