Leona VICTORS (Emenyonu),
et al., Plaintiffs,

v.

Wendy A. KRONMILLER,
et al., Defendants.

Civil No. JFM 07–2282.

United States District Court,
D. Maryland.

March 6, 2008.

534

536

James F. Crosson, Annapolis, MD, pro se.

Michael R. Carithers, Jr., Brown and Sheehan LLP, Baltimore, MD, for Plaintiffs.

Kathleen A. Ellis, Office of the Attorney General, Ranak Kanti Jasani, Stephen B. Caplis, Whiteford Taylor and Preston LLP, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

J. FREDERICK MOTZ, District Judge.

Plaintiffs Leona Victors and Home Care, Inc. d/b/a Leona's Heart Assisted Living ("Home Care") have brought civil rights claims against defendants Wendy A. Kronmiller, Jane Wessely, Barbara Shannon, and Ed Sadler ("State Defendants"),[1] and state contract and tort claims against defendant James F. Crosson.[2] (Compl. at 2.) Specifically, plaintiffs allege that after "discover[ing]" that Victors (an African American woman) had purchased Home Care, State Defendants "began a determined, aggressive and ultimately successful campaign of harassment, arbitrary enforcement of rules and regulations, and

---

**1.** Plaintiffs allege the following with respect to the positions of State Defendants: Kronmiller is Director of the Office of Health Care Quality ("OHCQ"), which is a unit of the Maryland Department of Health and Mental Hygiene ("DHMH") and issues the operating license for assisted living facilities; Wessely is the Chief of the Division of Waiver Programs ("DWP"), which is also part of DHMH; Shannon is Health Facilities Nurse Surveyor of the Residential and Community Program Unit within OHCQ; and Sadler is an Ombudsman for Upper Shore Aging, Inc., which is allegedly part of the Maryland Department of Aging ("DOA"), a division of DHMH. (Compl. ¶¶ 19–25.) Sadler denies that Upper Shore Aging, Inc. is part of DOA; he submits that it is a private, non-profit organization, and thus that he is not employed by the state of Maryland. (Sadler Answer ¶ 7.) Furthermore, State Defendants do not include Sadler as a "State Defendant" in their motion to dismiss. (State Defs.' Mem. at 1.)

**2.** Crosson is the former owner of the assisted living facility at issue in the instant case. (Compl. ¶ 23.)

discrimination specifically designed to put the now African American owned facility out of business...." (*Id.* ¶ 43.) As a result of these alleged actions, plaintiffs bring four counts-for violations of 42 U.S.C. §§ 1981, 1982, 1983, and 1985– against State Defendants. (*Id.* ¶¶ 83–106.) Plaintiffs request declaratory and injunctive relief, compensatory damages of $3 million, and punitive damages of $10 million for Victors's financial loss, emotional distress, and pain and suffering. (*Id.* at 29; ¶ 80.) Plaintiffs also request reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b). (*Id.* at 29.)

In addition, plaintiffs assert three counts—for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious intentional interference with prospective advantage—against defendant Crosson for his alleged nondisclosures when he sold Home Care to Victors, and for his alleged malicious and fraudulent interference with Victors' ability to operate the Home Care facility profitably. (*Id.* ¶¶ 107–138.) Plaintiffs also request compensatory damages of $3 million and punitive damages of $10 million against Crosson. (*Id.* at 29.)

State Defendants have moved to dismiss Counts One and Two on the ground that neither 42 U.S.C. § 1981 nor 42 U.S.C. § 1982 provides an independent cause of action against state actors. In the alternative, they contend that both claims must be dismissed because they are barred by the Eleventh Amendment. (State Defs.' Mem. at 6–7.) State Defendants argue that plaintiffs' § 1983 claim (Count Three) must also be dismissed because plaintiffs only sue the State Defendants in their official capacities, and thus State Defendants are not "persons" under § 1983. (*Id.* at 7–9.) State Defendants also argue that plaintiffs' § 1985 claim (Count Four) should be dismissed because the Eleventh Amendment bars suits against state officials where the state is "the real, substantial party in interest." (*Id.* at 10–12.) In the alternative, State Defendants assert that the factual allegations in plaintiffs' complaint are insufficient to state a claim for violation of § 1983 or § 1985. (*Id.* at 9, 12.)

Defendant Crosson has moved to disqualify plaintiffs' counsel, (Crosson's Mot. Disqualify and Remove at 1–3), and to dismiss plaintiffs' claims against him on the ground that this court lacks supplemental jurisdiction over his claim under 28 U.S.C. § 1367. (Crosson's Answer and Mot. Dismiss at 2.) In response, plaintiffs have moved to strike Crosson's answer as not in compliance with Rules 8 and 12 of the Federal Rules of Civil Procedure. (Pls.' Mot. to Strike at 1–3.) Plaintiffs also request reimbursement of their attorney's fees in responding to Crosson's pleading. (*Id.* at 3.)

For the reasons detailed below, I grant State Defendants' motion to dismiss plaintiffs' § 1981 and § 1982 claims, but deny the motion as to plaintiffs' § 1983 and § 1985 claims. I deny Crosson's motions to disqualify plaintiffs' counsel and to dismiss plaintiffs' state claims. I also deny plaintiffs' motion to strike and their request for reimbursement of attorney's fees.

## I.

The facts, as alleged in plaintiffs' complaint, are as follows. Home Care, an assisted living facility located in Greensboro, Maryland, relies on federal medicaid waiver payments administered by the Medicaid waiver unit of the Maryland Department of Aging ("DOA") as its primary payment source. (Compl.¶ 26.) Before plaintiff Victors purchased Home Care in April 2006, the facility had been owned only by white individuals—most recently defendant Crosson—whose participation in the Maryland Medicaid Waiver Program

had enabled them to operate Home Care profitably. (*Id.* ¶ 27.) While Home Care was under Crosson's ownership, the Maryland Office of Health Care Quality ("OHCQ") issued Home Care an operating license that was valid and effective from December 12, 2004 through December 11, 2006. (*Id.* ¶ 30.)

On February 15, 2006, pursuant to the applicable rules and regulations, representatives of OHCQ conducted a "re-licensure survey" to determine if the Home Care facility was in compliance with Maryland license requirements for assisted living programs. (*Id.* ¶ 31.) The OHCQ did not issue a report regarding deficiencies at Home Care during the period from February 2006 through May 2006, while Crosson still owned Home Care. (*Id.* ¶ 34.) Plaintiffs assert that although there is no "normal" time in which a report must be issued under the applicable rules and regulations, reports are issued "typically within one month of the survey teams' inspection of the facility." (*Id.* ¶ 33.)

On April 24, 2006, Crosson executed a purchase agreement to sell Home Care to Victors. (*Id.* ¶ 35.) Under the agreement, Victors purchased all rights and licenses of Home Care, including Home Care's OHCQ operating license and the DOA Medicaid waiver number. (*Id.*) Under the applicable rules and regulations, Victors was not required to renew Home Care's OHCQ operating license until December 31, 2006, when Crosson's license expired. (*Id.* ¶ 36.) Crosson did not disclose OHCQ's February 2006 inspection of Home Care, nor did he disclose that OHCQ would be submitting a report on any alleged deficiencies found during the inspection. (*Id.* ¶ 37.) Crosson also did not disclose correspondence between him and DOA shortly after he signed the purchase agreement on April 24, 2006, in which Crosson denied any change of ownership. (*Id.* ¶ 38; State Defs.' Ex. 3.) On June 9, 2006, Victors

purchased Home Care for one million dollars, becoming the first African American ever to own Home Care. (*Id.* ¶¶ 39–40.) At that time, 26 residents lived in Home Care: 14 had Medicaid waiver assistance, and the remaining 12 had applications pending. (*Id.* ¶ 42.)

Plaintiffs allege that almost immediately after Victors' purchase, the "[Maryland Department of Health and Mental Hygiene ("DHMH")], OHCQ, [Division of Waiver Programs ("DWP")], DOA and their officials, along with their units and directors" discriminated against plaintiffs on two "fronts:"

> (1) Arbitrary and unsupported denial of Medicaid benefits forcing an administrative appeal and decision by the administrative law judge affirming the legitimacy of the Plaintiffs' obvious entitlement to Medicaid funding; and (2) Arbitrary and unsupported reporting of scores of alleged 'deficiencies' driving up costs to 'fix' the alleged 'deficiencies,' spanning over eight months and costing Ms. Victors thousands of dollars and leading to the removal without cause or due process of almost all of her residents.

(*Id.* ¶ 44.)

As to the second "front," defendant Sadler (Ombudsman for Upper Shore Aging, Inc., allegedly part of DOA), Leslie Ruhl (Crosson's employee), and Sandy Ironmonger (Crosson's wife) began to make "frequent and confrontational" visits to Home Care soon after June 9, 2006. (*Id.* ¶¶ 45–49.) Sadler allegedly told Victors that "[t]here is no way that [Victors would] be allowed to practice in this county," that Victors must be "shot down," and that he was acting on the authority and direction of the "higher ups" within DHMH. (*Id.* ¶ 47.) Similarly, Ironmonger allegedly indicated that she and Crosson knew people in DHMH, OHCQ, and DOA, that Victors would be "shut down in no time," that her

Medicaid waiver number would be "yanked," and Victors would "never get it back, no matter what she did." (*Id.* ¶ 49.) Plaintiffs allege that "Crosson did not want to see an African American person operate his facility, and specifically acted, both directly and through agents, to thwart Ms. Victors' ability to operate the Home Care facility on a profitable basis." (*Id.* ¶ 128.)

At about the same time, OHCQ "through its officials and agents suddenly became interested in the alleged deficiencies" that were found during the February 15, 2006 inspection of Home Care. (*Id.* ¶ 50.) On June 21, 2006, Sadler and Ruhl personally delivered a document entitled "Notice of Directed Plan of Correction" ("First Report"), which contained 55 pages of alleged deficiencies and stated that "[w]e are forwarding these deficiencies to our legal counsel for a determination of whether additional licensure action is appropriate." (*Id.* ¶¶ 50–51.)

Plaintiffs allege that "DHMH, OHCQ, DWP and DOA, through its officials and agents, intended the First Report to create a number of problems for Ms. Victors so that there would be a tremendous burden on her to spend her money and time to address such deficiencies." (*Id.* ¶ 53.) After Victors addressed these deficiencies "in good faith," OHCQ conducted a second relicensure survey of Home Care from August 28, 2006 through September 1, 2006. (*Id.* ¶ 55.) Defendant Shannon was a member of this survey team, just as she had been in February 2006. (*Id.* ¶¶ 55, 31.) On September 25, 2006, Victors received a document entitled "Notice of Follow Up To Directed Plan of Correction" ("Second Report"), in which OHCQ increased the number of alleged deficiencies at Home Care. (*Id.* ¶ 56.)

Plaintiffs assert that many of these deficiencies were "simply wrong" and had been corrected since the First Report, and

that Defendant Shannon, and other representatives of DHMH, OHCQ, DWP and DOA, had purposely manipulated the results in the Second Report to cause Victors financial hardship. (*Id.* ¶¶ 57–58.) Defendants Kronmiller and Shannon attended a meeting requested by Victors's attorney to discuss the basis for the deficiencies and request an extension for curing them. (*Id.* ¶ 59.) OHCQ's survey teams, led by Shannon, submitted two more deficiency reports—on December 20, 2006 and March 2, 2007—in which they "continued to look for, and in most cases simply made up, purported deficiencies all in an effort to delay the time when Ms. Victors could obtain a new OHCQ operational license (after the initial one expired on December 31, 2006), and/or to drive up the money she had to spend to address the alleged deficiencies falsely reported...." (*Id.* ¶¶ 74–75.) After inspecting Home Care during the first week of February 2007, Defendant Kronmiller stated that the surveyors would decide next week whether to grant a OHCQ operating license; Home Care did not receive the license, however, until April 24, 2007. (*Id.* ¶¶ 78–79.)

As to the first "front"-the denial of Medicaid benefits-Victors received a call on September 18, 2006 from Upper Shore Aging, which is allegedly part of DOA, informing Victors that Upper Shore Aging had been authorized to physically remove the residents at Home Care. (*Id.* ¶ 61.) When Victors replied that she had received no notice informing her of this decision, she received on September 30, 2006 a fax of a letter dated September 18, 2006, in which defendant Wessely, Chief of DWP, stated that Home Care is "not a Medicaid provider and [has] fraudulently submitted claims for Medicaid payment." (*Id.* ¶ 62.) The letter also stated that Victors was required to return payment of $64,943.71; that Victors would not receive payment for the outstanding Medicaid invoices totaling

$21,000 she had submitted; and that Victors had 30 days to appeal the decision and institute administrative proceedings to reverse the denial of Home Care's Medicaid payments. (*Id.* ¶¶ 63–64.) Also on September 30, 2006, Wessely directed representatives of Upper Shore Aging, including defendant Sadler, to physically remove 14 Medicaid Waiver residents, which they did successfully by October 2, 2006. (*Id.* ¶¶ 65–66.)

After hearing plaintiffs' appeal, the administrative law judge granted "summary decision" for plaintiff on May 22, 2007, holding that plaintiffs were entitled to Medicaid funds. (*Id.* ¶ 69.) Despite the ALJ's decision, to this date plaintiffs have not received the September 2006 Medicaid waiver payment, nor has Home Care's Medicaid waiver number been re-activated. (*Id.* ¶ 70.) Presently only 8 residents live in Home Care—as opposed to 26 residents when Victors purchased Home Care-and Victors "continues to suffer financial loss . . . as a result of not being allowed to admit residents with a Medicaid waiver since Home Care is not naturally designed for private pay residents." (*Id.* ¶¶ 81.) Plaintiffs allege that because of Kronmiller's, Wessely's, Shannon's, and Sadler's actions "under color of law," and Crosson's private action, Victors will have to close Home Care. (*Id.* ¶ 82.)

**3.** Prior to *Twombly, Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), set the standard, granting 12(b)(6) dismissals for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

**4.** Section 1981 states in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a). Plaintiffs allege that State Defendants "have violated and continue to violate 42 U.S.C. § 1981 by discriminating against Ms. Victors on the basis of her race

## II.

### A. Legal Standard

In *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007), the Supreme Court held that, in order to survive a motion to dismiss, a plaintiff must plead plausible, not merely conceivable, facts in support of her claim.[3] The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Id.* at 1965. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1960. In considering a motion to dismiss, a court must "accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff." *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir.2001).

### B. State Defendants' Motion to Dismiss Plaintiffs' 42 U.S.C. § 1981 and 42 U.S.C. § 1982 Claims

State Defendants have moved to dismiss Counts One and Two on the ground that neither 42 U.S.C. § 1981[4] nor 42 U.S.C. § 1982[5] provides an independent cause of

and national origin concerning Ms. Victors' right to operate a legitimate business for profit [and] make and enforce contracts in connection with running the business. . . ." (Compl.¶ 89.)

**5.** Section 1982 states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Plaintiffs allege that State Defendants' "racially discriminating selective and arbitrary enforcement and application of the rules and regulations for assisted living facilities has interfered with the ability of the African American owned and

action against state actors. In the alternative, they contend that both claims must be dismissed because the Eleventh Amendment bars them. (State Defs.' Mem. at 6–7.)

State Defendants assert that 42 U.S.C. § 1983 [6] is the exclusive statute under which Victors and Home Care may bring suit for violations of § 1981 or § 1982. State Defendants rely on *Jett v. Dallas Independent School District,* in which the Supreme Court held "that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." [7] 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Thus, *Jett* held that to prevail on his claim for damages against the school district, the plaintiff was required to meet the requirements of § 1983. *Id.* at 735–36, 109 S.Ct. 2702. Specifically, plaintiff was required to show that the violation of his "right to make contracts" (protected by § 1981) was "caused by a[n] [official school district] custom or policy" of discrimination.[8]

Similarly, in *Dennis v. County of Fairfax,* the Fourth Circuit held that "[t]o the extent that [the plaintiff's claims of racial discrimination in hiring, promotion, and training] were pleaded under § 1981, they run afoul of *Jett* ... [T]he § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." 55 F.3d 151, 156 (4th Cir.1995). The court affirmed the district court's grant of summary judgment because plaintiff had not alleged or shown that the supposedly discriminatory decisions on his hiring, training, or promotion were pursuant to "official County custom or policy." *Id.*

 In the instant case, plaintiffs argue in response that *Jett* does not apply because plaintiffs have brought suit against State Defendants as "individual actors." (Pls.' Opp'n at 13.) In contrast, plaintiffs assert, the racial discrimination suits in *Jett* and *Dennis* were brought against municipalities: the plaintiff in *Jett* sued the school district, while the plaintiff in *Dennis* sued the county. *Jett,* 491 U.S. at 735–36, 109 S.Ct. 2702; *Dennis,* 55 F.3d at 156; *see also Philippeaux v. North Central Bronx Hosp.,* 871 F.Supp. 640, 656 (S.D.N.Y.1994) ("Consequently, based on the ... holding in *Monell,* which found municipal liability solely on the basis of

---

managed Home Care facility to transact business and minister to its residents, as well as interfered with the ability of the Home Care facility to properly be compensated by Medicaid payments." (Compl.¶ 93.)

**6.** 42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**7.** § 1981 and § 1982 claims, which were originally included in § 1 of the Civil Rights Act of 1866 under the authority of the Thirteenth Amendment, may be brought against private actors. In contrast, § 1983 claims are limited to state action. *Jett,* 491 U.S. at 731–32, 109 S.Ct. 2702.

**8.** *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that "Congress ... intend[ed] municipalities and other local government units to be included among those persons to whom § 1983 applies." A plaintiff is required to show either an "official policy" or "governmental custom" of discrimination to succeed in a § 1983 suit against a municipality. *Id.*

language in Section 1983 ..., I find that *Jett* continues to state accurately the law under which municipalities may be held liable for Section 1981 violations by their employees or agents."). Because plaintiffs are not suing a municipality—but instead four individuals employed by Maryland state agencies—plaintiffs contend that their § 1981 claim is valid. (Pls.' Opp'n at 13.)

▆ I conclude, however, that *Jett* applies to the instant case because State Defendants are clearly "state actors" within the definition of that term.[9] By arguing that they are suing "individual actors," plaintiffs appear to confuse the *Jett* issue with the issue of whether they are suing State Defendants in their individual or official capacities (discussed *infra* Part II.C). Even assuming that plaintiffs have sued State Defendants in their individual, rather than their official, capacities, the individual defendants are nonetheless state, not private, actors.[10] Thus, § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed to Victors and Home Care by § 1981. *Jett*, 491 U.S. at 735, 109 S.Ct. 2702.

Although no court has considered *Jett*'s holding in light of § 1982 suits, *Jett*'s reasoning applies equally well to § 1982 suits against state actors. Examining Section 1 of the Civil Rights Act of 1866—which was the source of both § 1981 and § 1982— *Jett* pointed out that "nowhere did the Act

provide for an express damages remedy for violation of the provisions of § 1." *Jett*, 491 U.S. at 720, 109 S.Ct. 2702; *see also Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 414 n. 13, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (noting that "42 U.S.C. § 1982 is couched in declaratory terms and provided no explicit method of enforcement"). *Jett* explained that the Supreme Court had properly implied a damages remedy for § 1981 and § 1982 suits against *private* actors because Congress had not established an application scheme. *Jett*, 491 U.S. at 731–32, 109 S.Ct. 2702. However, the Court had no power to imply or create a damages remedy for § 1981 suits against *state* actors because Congress had established its own application scheme in § 1983. *Id.* The Court did not address whether § 1983 is also the exclusive federal damages remedy for § 1982 claims brought against state actors because only § 1981 was at issue in *Jett*. *Id.* However, under precisely the same rationale, § 1983 should also be the exclusive federal damages remedy for § 1982 claims brought against state actors.

Furthermore, because only § 1983–not § 1981 or § 1982–provides explicit protection against actions "under color of [law]," it makes sense that the instant suit may only be brought under § 1983. Plaintiffs have alleged that State Defendants are employees of Maryland state agencies and violated plaintiffs' rights while acting "under color of law." (Compl. ¶¶ 19–22; 82).[11]

---

9. To determine whether a person is a "state actor," a court must examine "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Furthermore, "[i]n cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Because, in the

instant case, plaintiffs allege that State Defendants are employees of Maryland state agencies and violated plaintiffs' rights while acting "under color of law," (Compl.¶ 82), State Defendants are presumably state actors.

10. *See, e.g., Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir.1995), which refers to the defendant as a "state actor" regardless of whether he was sued in his individual or official capacity.

11. In the ·"Count One" and "Count Two" sections of their complaint alleging violations of § 1981 and § 1982, plaintiffs do not specif-

§ 1983 protects plaintiffs against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, § 1983 serves equally well as a remedy for the violation of plaintiffs' rights to "make and enforce contracts" under § 1981 and to "purchase, . . . hold, and convey . . . property" under § 1982.

For these reasons, I grant State Defendants' motion to dismiss plaintiffs' § 1981 and § 1982 claims.[12]

### C. State Defendants' Motion to Dismiss Plaintiffs' 42 U.S.C. § 1983 Claim

■ State Defendants argue that plaintiffs' 42 U.S.C. § 1983 claim must be dismissed because plaintiffs sue the State Defendants only in their official capacities. (State Defs.' Mem. at 7–9.) In the alternative, State Defendants assert that the factual allegations in plaintiffs' complaint are insufficient to state a claim for violation of § 1983. (*Id.* at 9.)

State Defendants assert that because the complaint "only sues [them] in their official capacity," it is "essentially a complaint against the State of Maryland," and thus State Defendants are not "persons" who can be sued under § 1983. (State Defs.' Mem. at 7.) In *Kentucky v. Graham,* the Supreme Court explained the distinction between personal-capacity and official-capacity suits. 473 U.S. 159, 165, 105 S.Ct.

3099, 87 L.Ed.2d 114 (1985). While personal-capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law," official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (internal quotation marks omitted). Thus, suits against state officials in their official capacity should be treated as suits against the state. *Id.* at 166, 105 S.Ct. 3099.

Furthermore, to establish personal liability in a § 1983 action, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* In contrast, "[m]ore is required in an official-capacity action . . . [:] the entity's 'policy or custom' must have played a part in the violation of federal law." *Id.* In *Will v. Michigan Department of State Police,* the Supreme Court made clear, however, that official-capacity actions under § 1983 may not be brought against *state* officials because, unlike municipalities (which *Monell,* 436 U.S. at 690, 98 S.Ct. 2018, held are "persons" under § 1983), "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." [13] 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Accordingly, while officials sued in their personal capacities are "persons" under § 1983, state officials sued in their official capacities are not.

---

ically allege that the defendants acted "under color of law." (Compl.¶¶ 83–96.) However, plaintiffs can sue State Defendants only for actions taken "under color of law" because any suit against the Maryland state agencies would be barred by the Eleventh Amendment, and plaintiffs cannot plausibly sue the defendants as private actors.

**12.** Because I dismiss plaintiffs' § 1981 and § 1982 claims under *Jett,* I will not address State Defendants' argument that the claims are barred by the Eleventh Amendment. (*See* State Defs.' Mem. at 7 n. 1.)

**13.** *Will* noted, however, that "[o]f course a state official in his or her official capacity, when sued for *injunctive* relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." 491 U.S. at 71 n. 10, 109 S.Ct. 2304 (emphasis added) (internal quotation marks omitted) (citing *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. 3099; *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

■ The Fourth Circuit has held that when a plaintiff does not allege specifically in what capacity he is suing a state official, "a court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows,* 66 F.3d 56, 61 (4th Cir.1995). *Biggs* introduced three factors that indicate that a suit has been brought against a state actor personally: (1) the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on the face of the complaint; (2) a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits; and (3) the nature of any defenses raised in response to the complaint, including qualified immunity, which is available only in a personal capacity suit.[14] *Id.* Throughout this analysis, "the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly." *Id.*

Applying these factors in *Biggs,* the court held that although not explicitly stated in the complaint, the plaintiff had brought a § 1983 action against a prison official and nurse in their individual, rather than their official, capacities. *Id.* at 61–62. Specifically, the court found that (1) Biggs' allegations focused on defendants' actions towards him and did not necessarily implicate an official policy or custom; (2) Biggs sought compensatory damages; and (3) defendants asserted, among other defenses, that they were entitled to qualified immunity. *Id.* at 61. The third factor was accorded less weight "than otherwise

would be the case," however, because the defendants also raised the issue of Eleventh Amendment immunity. *Id.*

Applying the three factors in the instant case, I conclude that, although it is a close question, plaintiffs have sued State Defendants in their individual capacity. As to the first factor, plaintiffs' complaint includes allegations of both a governmental policy on the one hand, and independent action taken under color of law by the State Defendants, on the other. In the "Preliminary Statement" and "Introduction," plaintiffs consistently make allegations against DHMH, OHCQ, DWP, DOA, and their "agents, servants, employees, and officials," but do not make specific allegations against the four named State Defendants. (Compl. at 2; ¶¶ 1–12.) Furthermore, plaintiffs allege that these agencies and their officials "have exhibited a concerted and aggressive *practice* to enforce and prosecute the rules and regulations ... in a discriminatory manner" and "continue to engage in, maintain and enforce, *policies and practices* for the *specific purpose* that assisted living facilities ... owned by African Americans will be shut down...." (*Id.* ¶¶ 10–11 (emphasis added).) Plaintiffs allege in numerous paragraphs of the complaint that these agencies, "through [their] officials and agents," discriminated against plaintiffs. (*Id.* ¶¶ 28, 43, 53.)

On the other hand, plaintiffs allege specific discriminatory actions taken under the color of law by the four named State Defendants against plaintiffs. (*Id.* ¶¶ 59, 78–79, 82, 85, 93, 99, 104 (Kronmiller); 62–65, 82, 85, 93, 99, 104 (Wessely); 31, 58–59, 73–74, 82, 85, 93, 99, 104 (Shannon); 45–50,

---

**14.** An official in a personal-capacity action "may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law," including absolute and qualified immunity. *Graham,* 473 U.S. at 166–67, 105 S.Ct. 3099. In contrast, the only immunities that can be claimed in an official-capacity action "are forms of sovereign immunity that the entity ... may possess, such as the Eleventh Amendment." *Id.* at 167, 105 S.Ct. 3099.

65, 73, 82, 85, 93, 99, 104 (Sadler).) Specifically, Kronmiller allegedly attended a meeting to discuss the multiple flawed OHCQ reports detailing Home Care's deficiencies and was allegedly two months tardy in providing plaintiffs with their new OHCQ operating license (*Id.* ¶¶ 59, 78–79); Wessely allegedly authorized Upper Shore Aging to physically remove Home Care's residents without due process and incorrectly denied plaintiffs Medicaid payments, (*Id.* ¶¶ 62–65); Shannon allegedly manipulated the results of the Second Report to include deficiencies in Home Care's facilities that were "simply wrong," (*Id.* ¶¶ 58–59); and Sadler allegedly voiced his intention to shut down plaintiffs' business, contacted people doing business with Home Care to achieve this goal, and physically removed Home Care residents without due process. (*Id.* ¶¶ 47, 73, 65.)

As to the second factor-the relief requested-plaintiffs in the instant case seek compensatory and punitive damages. (*Id.* at 2, 29; ¶ 29.) Finally, as to the third factor-the nature of any defenses raised in response to the complaint-State Defendants do not raise any defenses in their motion to dismiss plaintiffs' § 1983 claim, and have not filed an answer. Accordingly, while the first factor is inconclusive, and the third factor is of no help, the second factor indicates that plaintiffs sued State Defendants in their individual capacities. Although plaintiffs' argument that they sued State Defendants in their personal capacity is perhaps weaker than in *Biggs*, "the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly." *Biggs,* 66 F.3d at 61. With this in mind, the *Biggs* court stated as to the second factor: "it would have been both illogical and futile for Mr. Biggs to sue the defendants in their official capacities and to then request a form of relief that would clearly be unavailable to him in such a suit." *Id.* (citations omitted).

Similarly, in the present case, plaintiffs clearly intended to obtain compensatory and punitive damages against the four individual State Defendants, which, if they had sued defendants in their official capacities, would not be possible under § 1983 (and would be barred by the Eleventh Amendment). This intention is demonstrated not only by their request for damages, but also by their specific discussion of the allegedly discriminatory actions taken by the four individual defendants. Thus, under the three-factor test and the reasoning of *Biggs,* it can be fairly ascertained that plaintiffs intended to sue State Defendants in their personal capacities. Accordingly, I decline to dismiss plaintiffs' § 1983 claim on the ground that State Defendants are allegedly not "persons" for purposes of § 1983.

■■■■ State Defendants argue in the alternative that the factual allegations in the plaintiffs' complaint are insufficient to state a claim for violation of § 1983. (State Defs.' Mem. at 9.) Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred...." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). To establish a claim under § 1983, plaintiffs must prove two elements: (1) that State Defendants "deprived [plaintiffs] of a right secured by the Constitution and laws of the United States;" and (2) that they "deprived [plaintiffs] of this constitutional right under color of State statute, ordinance, regulation, custom, or usage." *Mentavlos v. Anderson,* 249 F.3d 301, 310 (4th Cir.2001) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

As to the second element, plaintiffs properly allege that State Defendants' actions were taken under "color of state law." (Compl.¶¶ 99–101.) Plaintiffs allege

that the four State Defendants were employees of a Maryland state agency, (*Id.* ¶¶ 19–22), and allegedly misused their power as state officials to violate plaintiffs' constitutional rights.[15] (*Id.* ¶¶ 31, 45–50, 58–59, 62–65, 73–74, 78–79, 82, 85, 93, 99, 104.)

As to the first element, plaintiffs allege that State Defendants deprived plaintiffs of their due process and equal protection rights under the Fourteenth Amendment to the U.S. Constitution.[16] (*Id.* ¶¶ 99–101.) As to due process, plaintiffs apparently contend that State Defendants deprived Victors of her property interest in Home Care without due process of law. The facts alleged in the complaint that purportedly support this contention are that Kronmiller was two months tardy in providing plaintiffs with their new OHCQ operating license, (*Id.* ¶¶ 78–79); Wessely authorized Upper Shore Aging to physically remove Home Care's residents without due process and incorrectly denied plaintiffs Medicaid payments, (*Id.* ¶¶ 62–65); and Sadler physically removed Home Care residents without due process. (*Id.* ¶ 65.)

Two of these allegations could plausibly support a due process violation. Although plaintiffs complain about the delay in Kronmiller's providing the operating license, they do not allege that any rule or regulation entitled them to receive the license any earlier, and thus do not plausibly allege a due process violation.[17] Similarly, the allegation that Victors has not received the September 2006 Medicaid waiver payment and that the Home Care waiver number has not been re-activated, (*Id.* ¶ 70), are also not due process violations because the ALJ's decision is not yet final. (State Defs.' Mem. at 5.) In contrast, Wessely's sudden denial of plaintiffs' Medicaid payments—which the ALJ found without merit-could plausibly constitute a due process violation. (*Id.* ¶¶ 64, 69.) Wessely's and Sadler's alleged physical removal of Home Care residents—although potentially only a violation of the residents' liberty under the Due Process Clause— could also perhaps have deprived plaintiffs of a property interest in running their business. It might become clear after discovery and after the ALJ decision is final that Wessely's and Sadler's actions were justified; however, this determination cannot be made at this time. Accordingly, I conclude that plaintiffs have stated a § 1983 claim for violation of their Fourteenth Amendment due process rights.

 Plaintiffs' complaint also alleges a plausible set of facts in support of their Fourteenth Amendment equal protection claim under § 1983. "To succeed on an equal protection claim, a plaintiff must ... demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir.

---

**15.** "Color of law" is defined as "[t]he appearance or semblance, without the substance, of legal right. Misuse of power, possessed by virtue of state law and made possible only because wrongdoer is clothed with authority of state, is action take under 'color of law.'" *Black's Law Dictionary* 241 (5th ed.1979).

**16.** The Fourteenth Amendment's Due Process and Equal Protection clauses provide that "No State ... shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

**17.** In *Board of Regents of State Colleges v. Roth*, the Supreme Court held that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

2001). Plaintiffs allege that State Defendants deprived Home Care of the equal protection of the law on the basis of race. (Compl.¶ 100). Specifically, plaintiffs allege that after Victors purchased Home Care-becoming the first African American to own the facility-the State Defendants and the agencies for which they worked "suddenly changed [their] practice and began to enforce discriminately and arbitrarily various alleged violations of rules and regulations." (*Id.* ¶ 28.)

Plaintiffs allege that Shannon manipulated the results of the Second Report to include deficiencies in Home Care's facilities that were "simply wrong," while Kronmiller allegedly attended the meeting to discuss these flawed reports and was two months tardy in providing plaintiffs with their new OHCQ operating license. (*Id.* ¶¶ 58–59, 74, 78–79). Sadler allegedly voiced his intention to shut down plaintiffs' business and contacted people doing business with Home Care to achieve this goal, and both he and Wessely allegedly physically removed Home Care's residents against there will. (*Id.* ¶¶ 47, 73, 65.)

Under *Twombly,* the complaint must state "more than labels and conclusions.... Factual allegations must be enough to raise a right to relief above the speculative level...." 127 S.Ct. at 1965. Plaintiffs have satisfied this standard by alleging facts from which one could plausibly infer that State Defendants discriminated against plaintiffs on the basis of race. *See Morrison,* 239 F.3d at 654. Victors was allegedly the first African American owner of the Home Care facility. (Compl.¶ 28.) The previous white owners, including Crosson, had allegedly been allowed by OHCQ and DOA to participate in the Maryland Medicaid Waiver Program, enabling them to operate the Home Care facility profitably. (*Id.* ¶ 27.) It could very well be that the owners prior to Crosson were granted access to the medicaid waivers because they met the Maryland rules and regulations for assisted living facilities, while Victors was justifiably denied access because she failed to meet these standards.

However, it is plausible that at least Crosson was granted access to these waivers *despite* the numerous violations of the rules and regulations, which Victors inherited without notice when she purchased Home Care.[18] Thus, State Defendants' sudden and aggressive enforcement of these rules beginning on June 21, 2006—twelve days after Victors took over the facility—and continuing through their removal of residents in September—October 2006 and the submission of their fourth deficiency report in less than nine months in March 2007 indicates their discriminatory treatment of Victors. (*Id.* ¶¶ 50–75.) That this discrimination was motivated by Victors' race can plausibly be inferred from the allegation that she was the first African

---

**18.** It could be that State Defendants did not know of these violations until after Victors took over the facility on June 9, 2006. However, numerous allegations suggest otherwise. State Defendants allegedly conducted a "relicensure survey" of the facility on February 15, 2006, over *four* months before their June 21, 2006 report informing Victors of the deficiencies. (Compl.¶¶ 31, 50.) Following this June letter, they allegedly conducted another survey just two months later, issued a second report less than four weeks after this survey, and began removing residents within days after the second report. (*Id.* ¶¶ 55, 56, 66.) These increasingly shorter intervals suggest not only discriminatory enforcement of the rules and regulations, but also that State Defendants should have performed (or perhaps did perform) inspections of the facility before February 2006 while Crosson was owner, and should have found (or did find) deficiencies that were not reported. That OHCQ allegedly submitted two more deficiency reports against Victors, one in December 2006 and another in March 2007, further supports this conclusion. (*Id.* ¶ 75.)

American to own Home Care; from Sadler's hostile statement that Victors must be "shot down"; from Wessely's and Sadler's extreme decision to physically remove residents; from Shannon's fabrication of purported deficiencies in OHCQ's reports; and from Kronmiller's over two month delay in granting Victors a new OHCQ operating license. (*Id.* ¶¶ 28, 47, 66, 74, 78–79.) Accordingly, I conclude that plaintiffs' have pled sufficient facts in support of their equal protection claim to survive a motion to dismiss.

Because plaintiffs have sued State Defendants in their individual capacities and have stated plausible facts in support of their due process and equal protection claims, I deny defendant's motion to dismiss plaintiffs' § 1983 claim.

**D. State Defendants' Motion to Dismiss Plaintiffs' 42 U.S.C. § 1985 Claim**

State Defendants have moved to dismiss plaintiffs' 42 U.S.C. § 1985 [19] claim because they argue that the Eleventh Amendment bars this claim, and in the alternative, that the factual allegations are insufficient. (State Defs.' Mem. at 10.)

 State Defendants argue that the allegations in plaintiffs' complaint "all relate to actions allegedly taken by these individuals in their official capacity, and any judgment against them would, in effect, be against the State of Maryland." (*Id.* at 10–11.) The Eleventh Amendment bars a suit against state officials when "the state is the real, substantial party in inter-

est." *Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quotations and citations omitted). The general rule is "that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Id.* at 101 n. 11, 104 S.Ct. 900 (quotations and citations omitted).

 In the instant case, the Eleventh Amendment does not bar plaintiffs' § 1985 claim because plaintiffs have sued State Defendants in their individual capacities. Had plaintiffs sued State Defendants for money damages in their *official* capacities, this would be a suit against the state, *see Hafer,* 502 U.S. at 25, 112 S.Ct. 358, and thus it would be barred by the Eleventh Amendment. *Pennhurst,* 465 U.S. at 101, 104 S.Ct. 900. But because plaintiffs sued State Defendants for money damages in their *individual* capacities, this is a suit for money damages from the State Defendants' own pockets, and thus it is not barred by the Eleventh Amendment. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. 358("... the Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983") (citing *Scheuer v. Rhodes,* 416 U.S. 232, 238, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). State Defendants do not provide, nor have I found, any

---

**19.** Section 1985 provides in relevant part: "If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or depri-

vation, against any one or more of the conspirators." 42 U.S.C. § 1985(3). § 1985 provides a cause of action against private actors as well as public actors. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) ("In [*Griffin v. Breckenridge,* 403 U.S. 88, 101–102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)] this Court held, reversing a 20–year–old precedent, ..., that § 1985(3) reaches not only conspiracies under color of state law, but also purely private conspiracies.")

reason why this rule should not apply equally to a § 1985 claim.

State Defendants needlessly complicate this issue, asserting that "[a] claim that an official erroneously exercised his or her official authority is not sufficient to convert an 'official capacity' suit into a suit for personal liability," and that "[a] state officer may be said to be acting *ultra vires* (and thus to lose the protection of the Eleventh Amendment) only when he or she acts 'without any authority whatever.'" (State Defs.' Mem. at 11) (citing *Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982)). These statements of the law do not have any bearing, however, on an individual-capacity suit against a state officer alleging the deprivation of a federal right:

> Since *Ex parte Young*, ... it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law.... While the doctrine of *Ex parte Young* does not apply where a plaintiff seeks damages from the public treasury, damages awards against individual defendants in federal courts are a permissible remedy in some circumstances notwithstanding the fact that they hold public office.[20]

*Hafer*, 502 U.S. at 30, 112 S.Ct. 358 (citing *Scheuer*, 416 U.S. at 237–38, 94 S.Ct. 1683) (internal quotation marks omitted). Accordingly, because plaintiffs sued State Defendants in their individual capacities, the Eleventh Amendment does not bar plaintiffs' § 1985 claim.

 In the alternative, State Defendants argue that plaintiffs' § 1985 claim should be dismissed because "the plaintiffs have alleged no facts that support an inference that there was an agreement among the defendants to violate the plaintiffs' constitutional rights or that the defendants actually violated the plaintiffs' constitutional rights." (State Defs.' Mem. at 12.) To establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy. *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir.1995).

Just as with plaintiffs' § 1983 claim, they have pled sufficient factual allegations in support of their § 1985 claim. Plaintiffs allege that the State Defendants, in violation of § 1985, "have conspired with agents, servants, employees and officials of white owned or white controlled private organizations that are run by white managers to deprive the Plaintiffs of the equal protection of the laws." (Compl.¶ 104.) Specifically, they allege that "one of more of the Defendants, including Defendants Shannon and Sadler, took numerous specific acts in furtherance of the conspiracy, including contacting various people and groups doing business with the Home Care facility in an effort to impede Ms. Victors' and the Home Care facility's successful operation." (*Id.* ¶ 104.)

Plaintiffs have pled sufficient facts of (1) a conspiracy that (4) resulted in injury to plaintiff as (5) a consequence of an overt act. Kronmiller, Shannon, Wessely and

---

**20.** The Court found damages awards against individual defendants permissible in *Scheuer*, where—similar to the instant case—the plaintiffs brought suit against state officials in their personal capacities for alleged deprivation of their constitutional rights. 416 U.S. at 238, 94 S.Ct. 1683.

Sadler all allegedly conspired to varying degrees among themselves and others to put plaintiffs out of business. (*Id.* ¶¶ 45–49, 59, 65, 73.) Furthermore, these defendants allegedly carried out various overt acts-including allegedly fabricating false deficiencies in their reports, physically removing Home Care residents, and denying Home Care medicaid payments and an operating license, (*Id.* ¶¶ 57, 65, 63, 79)-which resulted in financial injury to plaintiffs. (*Id.* ¶ 106.) As discussed *supra* Part C, plaintiffs have also pled sufficient facts that State Defendants (2) were motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all. For these reasons, I deny State Defendants' motion to dismiss plaintiffs' § 1985 claim.

### III.

Crosson has moved to disqualify plaintiffs' counsel, Michael R. Carithers, Jr., and the firm Brown & Sheehan, LLP because of an alleged conflict of interest. (Crosson's Mot. Disqualify at 1–3.) The alleged conflict of interest stems from a consultation meeting Crosson had six years ago with another attorney at Brown & Sheehan, LLP, David M. Sheehan, at a time when Sheehan was allegedly working at Venable, LLP. (*Id.* at 1–2.) During the third quarter of 2000, Crosson contacted Sheehan to represent Crosson and one of his businesses, The Corner Clinic, which had a dispute with Maryland's Department of Health and Mental Hygiene ("DHMH"). (*Id.* at 2.) Crosson alleges that Sheehan agreed to represent Crosson and his company and accepted a retainer from Crosson. (*Id.*) Sheehan allegedly met with Crosson on more than one occasion and shared privileged and confidential informa-

tion and documents "which were of a personal, business, and financial nature" with Sheehan. (*Id.* at 2–3.) During this time, in the third quarter of 2000, Crosson owned Home Care, Inc., which plaintiff Victors now owns. (*Id.* at 3.)

Plaintiffs' counsel concedes that in August 2000 Sheehan met with Crosson, who was seeking legal representation for Corner Clinic. (Pls.' Reply to Mot. Disqualify at 2.) However, Sheehan submits that on that same day he realized that he had a conflict of interest and could not be retained by Crosson. (*Id.*; Sheehan Aff. ¶ 5.) Sheehan asserts that no confidential information was disclosed to him and he returned Crosson's uncashed retainer check and the materials Crosson had provided to him by overnight delivery. (Sheehan Aff. ¶ 5, Ex. 2.[21]) Sheehan also submits that he has never been a partner at or been employed by Venable, LLP; has never heard of Home Care, Inc.; has never met plaintiff Victors; and has no first hand knowledge of the matters in this lawsuit. (*Id.* ¶¶ 1, 4.)

"Disqualification is a drastic remedy since it deprives litigants of their right to freely choose their own counsel"; it is permitted "only where the conflict is such as clearly to call in question the fair and efficient administration of justice." *Gross v. SES Americom, Inc.,* 307 F.Supp.2d 719, 722–23 (D.Md.2004) (Titus, J.). For this reason, the moving party "bear[s] 'a high standard of proof to show that disqualification is warranted....'" *Franklin v. Clark,* 454 F.Supp.2d 356, 365 (D.Md.2006) (Blake, J.) (citing *Buckley v. Airshield Corp.,* 908 F.Supp. 299, 304 (D.Md.1995) (Williams, J.)). To succeed on a disqualification motion, the moving party must establish, first, that an attorney-client relationship existed between the

---

**21.** Sheehan has attached to his affidavit as Exhibit 2 his August 23, 2000 letter to Crosson, informing Crosson that Sheehan could not be retained by him and enclosing the materials Crosson had given Sheehan and Crosson's retainer check.

challenged law firm and the objecting client, and second, that the matter at issue in the challenged representation is the same or substantially related to the matter involved in the prior representation.[22] *Gross*, 307 F.Supp.2d at 723 (citing *Stratagene v. Invitrogen Corp.*, 225 F.Supp.2d 608, 610 (D.Md.2002) (Chasanow, J.)).

In the instant case, it is unclear whether an attorney-client relationship existed between Crosson and David Sheehan. While Crosson alleges that Sheehan agreed to represent Crosson and Corner Clinic, accepted a retainer from Crosson, and was privy to confidential information, (*Id.* at 2–3), Sheehan testifies that upon realizing the same day he first met with Crosson that he had a conflict of interest, he returned Crosson's uncashed retainer check and documents by overnight delivery and ensured that no confidential information was disclosed to him. (Sheehan Aff. ¶ 5, Ex. 2.) Even if an attorney-client relationship existed between Sheehan and Crosson in 2000, it did not exist while Sheehan was at Brown & Sheehan, LLP, the firm at which plaintiffs' attorney, Michael R. Carithers, Jr., currently works. (Crosson's Mot. Disqualify at 1–2.) Thus, the attorney-client relationship was not between the "challenged law firm" and the "objecting client." *Gross*, 307 F.Supp.2d at 723. Furthermore, because Carithers, not Sheehan, is now representing Crosson, MLRPC 1.9 does not directly apply to the instant case.

MLRPC 1.9 does, however, apply through MLRPC 1.10, which governs the imputation of conflicts of interest.

MLRPC Rule 1.10 provides in relevant part: "(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule . . . 1.9. . . ." Thus, Carithers may not represent plaintiffs if Sheehan would be prohibited by MLRPC 1.9 from representing plaintiffs. The rule in MLRPC 1.9—that Carithers may not represent plaintiffs "in the same or a substantially related matter in which [plaintiffs'] interests are materially adverse to [Crosson's] interests"—is almost identical to the rule applied in *Gross*: that Carithers may not represent plaintiffs if "the matter at issue in the challenged representation is the same or substantially related to the matter involved in the prior representation." *Gross*, 307 F.Supp.2d at 723.

In determining whether a former and current matter are " 'substantially related,' it is not necessary that the two representations involved the same operative facts so long as there is a sufficient similarity of issue." *Stratagene*, 225 F.Supp.2d at 611 (inner quotation marks and citations omitted). The court's primary concern is "whether there is a reasonable probability that confidences were disclosed in the prior representation which could be used against the former client in the current litigation. . . ." *Id.* For this reason, the court must analyze "the nature and scope of the prior and present representations and determine whether confidences might have been disclosed in the course of the prior representation which could be relevant to the present action."[23] *Id.*

---

22. Under Local Rule 704, this court applies the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") as they have been adopted by the Maryland Court of Appeals. Rule 1.9 of the MLRPC, entitled "Duties to Former Clients," provides in relevant part: "(a) A lawyer who has formerly represented a client in a matter shall not thereafter repre-

sent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

23. MLRPC Rule 1.10 Comment 3 similarly states that the rule in paragraph (a) of Rule

Although both Corner Clinic's dispute with DHMH (the prior representation) and Crosson's dispute with Victors (the challenged representation) potentially dealt with health and facility deficiencies in Crosson's businesses, I conclude that there is not a "sufficient similarity of issue" between them. *Stratagene*, 225 F.Supp.2d at 611. Corner Clinic and Home Care are two separate businesses that apparently have no connection other than Crosson's ownership of them. In addition, Corner Clinic's dispute was with a Maryland agency, while Crosson's dispute is with Victors and involves his alleged nondisclosures in his sale of the business and his subsequent tortious interference with Home Care.

Furthermore, the probability that confidences from Sheehan's prior alleged representation of Corner Clinic could be used against Crosson in the instant case is low. Not only are the issues different, but Sheehan has also testified that "I am certain that I am not in possession of any confidential information and I have absolutely no recall of what the potential claim was that Mr. Crosson brought to my prior firm." (Sheehan Aff. ¶ 4.) Sheehan has also testified: "I have no specific recollection of [Corner Clinic] or what it does." (Sheehan Aff. ¶ 4.) Sheehan's August 23, 2000 letter, which enclosed Crosson's materials and retainer check, supports Sheehan's testimony. (Sheehan Aff., Ex. 2.) Furthermore, Sheehan submits that Carithers alone has represented plaintiffs in this lawsuit, and that Sheehan has never met Victors, has never heard of Home Care, Inc., and does not have specific knowledge of the matters at issue in this case. (Sheehan Aff. ¶¶ 1, 4.)

Because (1) it is dubious whether an attorney-client relationship existed between Crosson and Sheehan, (2) the matter at issue in the prior representation is not the same or substantially related to the challenged representation, and (3) the probability is low that confidences from the prior representation could be used against Crosson in the current litigation, I deny Crosson's motion to disqualify plaintiffs' counsel.

## IV.

▮▮▮▮ Defendant Crosson has also moved to dismiss plaintiffs' claims against him[24] on the ground that this court lacks supplemental jurisdiction over his claims under 28 U.S.C. § 1367.[25] (Crosson's Answer and Mot. Dismiss at 2.) Specifically, Crosson argues that "[t]he sale of stock and the sale of an LLC interest [in the Home Care facility] are not supplemental to the civil rights claims brought against the State of Maryland...." (*Id.*) As the Supreme Court has stated, "pendent jurisdiction may be exercised when federal and state claims have a 'common nucleus of operative fact' and would 'ordinarily be expected to be tried all in one judicial proceeding.'" *Osborn v. Haley*, 549 U.S. 225, 127 S.Ct. 881, 896, 166 L.Ed.2d 819 (2007) (quoting *United Mine Workers v.*

---

1.10 does not prohibit representation "where neither questions of client loyalty *nor protection of confidential information* are presented" (emphasis added).

**24.** Plaintiffs bring three state claims against Crosson: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) tortious intentional interference with prospective advantage. (Compl.¶¶ 107–138.)

**25.** 28 U.S.C. § 1367(a) states in relevant part: "Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

*Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). "Supplemental claims ... need only revolve around a central fact pattern." *White v. County of Newberry, S. C.,* 985 F.2d 168, 172 (4th Cir.1993). On the other hand, "supplemental jurisdiction does not encompass claims when one count is 'separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to the other count.'" *Id.* at 171 (citing *Hales v. Winn–Dixie Stores, Inc.,* 500 F.2d 836, 848 (4th Cir.1974)).

■ I conclude that it is proper to exercise supplemental jurisdiction over plaintiffs' state claims against Crosson. Plaintiffs' two state contract claims against Crosson (for allegedly not disclosing to Victors the deficiencies found in State Defendants' earlier inspection of the Home Care facility) and plaintiffs' federal claims against State Defendants (for their allegedly discriminatory enforcement of the Maryland rules and regulations) "revolve around a central fact pattern" because plaintiffs confronted the enforcement of these regulations *only after* (and allegedly *because* ) Victors purchased the facility from Crosson. *White,* 985 F.2d at 172.

The allegations supporting plaintiffs' third claim against Crosson—"tortious intentional interference with prospective advantage"—even more clearly demonstrate that plaintiff's state claims against Crosson and federal claims against State Defendants arose from a "common nucleus of operative fact." *Osborn,* 127 S.Ct. at 896. After selling Home Care to Victors, Crosson allegedly "began a campaign" to put plaintiffs out of business, (Compl.¶¶ 114, 120, 127), much like the discriminatory campaign that State Defendants allegedly carried out. (*Id.* ¶ 105.) Plaintiffs allege in their tort claim that "Crosson did not want to see an African American person operate his facility, and specifically acted, both directly and through agents [State Defendants Sadler and Shannon], to thwart Ms. Victors' ability to operate the Home Care facility on a profitable basis." (*Id.* ¶ 128, 73.) Specifically, Crosson's wife, Sandy Ironmonger, and Crosson's employee, Leslie Ruhl, allegedly joined State Defendant Sadler in making frequent, confrontational visits to Home Care after Crosson had sold the facility. (*Id.* ¶¶ 45–46, 48–49, 80.)

Because plaintiffs' state and federal claims both revolve around a "campaign" to drive plaintiffs out of business, these claims "are so related ... that they form part of the same case or controversy under Article III," 28 U.S.C. § 1367, and would "ordinarily be expected to be tried all in one judicial proceeding," *Osborn,* 127 S.Ct. at 896. Thus, I deny Crosson's motion to dismiss.

## V.

Plaintiffs have moved to strike Crosson's "Answer to Complaint and Motion to Dismiss" on the ground that it is not in compliance with Rules 8 and 12 of the Federal Rules of Civil Procedure. (Pls.' Mot. to Strike at 3.) Specifically, plaintiffs assert that (1) Crosson "intends to circumvent the requirement that he must respond to the complaint within the time period specified in the summons and in accordance with the Federal Rules of Civil Procedure," and (2) Crosson's answer "does not come anywhere near to addressing the 138 paragraphs of allegations in the complaint as required under [Federal Rule of Civil Procedure 8(b)], nor does he provide anywhere near a proper legal basis for which the complaint should be dismissed." (*Id.* at 2.)

As to plaintiffs' first reason, Rule 12(a) requires that a defendant serve an answer within 20 days after being served with the complaint. Fed.R.Civ.P. 12(a). Plaintiffs

concede that Crosson was finally served on November 7, 2007, and filed his answer within the 20–day time period, on November 21, 2007. (Pls.' Mot. to Strike at 3.) They argue nonetheless that Crosson spent two months "evading service of the complaint," which was filed in August 2007. (*Id.* at 2.) It is unclear, however, whether Crosson evaded service or whether plaintiffs were at fault for having the wrong address. (*See* Crosson's Reply to Mot. Strike at 1–2.) Accordingly, this first reason to strike Crosson's answer is unpersuasive.

■ Plaintiffs' second reason carries more weight. Rule 8(b) requires that "[a] party shall state in short and plain terms the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." Fed.R.Civ.P. 8(b). Crosson's answer falls far short of this standard. It does not specifically address any paragraphs of plaintiffs' complaint. Besides restating the names and domiciles of the parties and plaintiffs' claims against Crosson, Crosson's answer includes only a motion to dismiss plaintiffs' claims for lack of subject matter jurisdiction. (Crosson's Answer and Mot. Dismiss at 2.)

Although Crosson's answer is inadequate, striking the answer is not the solution. Federal Rule of Civil Procedure 12(f) permits a district court, on a motion of a party, to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." [26] The issue here is not that Crosson has included an insufficient defense or scandalous matter, but instead that his answer is generally insufficient. Thus, I order Crosson to amend his answer promptly to comply with the requirements of Rule 8(b), and to avoid default judgment.

■ Plaintiffs also request reimbursement of their attorney's fees in responding to Crosson's "absolutely frivolous" pleading. (Pls.' Mot. to Strike at 3.) Although plaintiffs do not specify, they presumably seek this relief under Rule 11.[27] Under Rule 11, "the primary purpose of sanctions against counsel is not to compensate the prevailing party, but to deter future litigation abuse." *Hunter v. Earthgrains Co. Bakery,* 281 F.3d 144, 151 (4th Cir.2002) (citations omitted). As the Fourth Circuit has stated, "it is axiomatic that asserting a *losing* legal position, even one that fails to survive summary judgment, is not of itself sanctionable conduct." *Id.* (emphasis in original). "[M]aintaining a legal position to a court is only sanctionable when, in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified." *Id.* at 153.

■ Rule 11 sanctions are not warranted in the instant case. The issue of whether this court has supplemental jurisdiction

---

**26.** Rule 12(f) motions are generally viewed with disfavor "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore,* 252 F.3d 316, 347 (4th Cir.2001) (citations omitted). Nonetheless, "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and should be deleted." *Id.*

**27.** Under Rule 11, by presenting a written motion to the court, an attorney or unrepresented party "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the motion "is not [ ] presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;" and that "the claims, defenses, and other legal contentions therein are warranted by existing law . . . ." Fed.R.Civ.P. 11(b).

over plaintiffs' state claims is a close question, and thus Crosson's argument was "legally justified." *Hunter*, 281 F.3d at 153. Crosson's answer, while inadequate, clearly falls short of requiring Rule 11 sanctions; ordering Crosson promptly to amend his answer will sufficiently "deter future litigation abuse." *Id.* at 151.

For the foregoing reasons, I grant State Defendants' motion to dismiss plaintiffs' § 1981 and § 1982 claims, but deny the motion as to plaintiffs' § 1983 and § 1985 claims. I deny Crosson's motions to disqualify plaintiffs' counsel and to dismiss plaintiffs' state claims. I also deny plaintiffs' motion to strike and their request for reimbursement of attorney's fees. A separate order to that effect is being entered herewith.

### ORDER

For the reasons stated in the accompanying Opinion, it is, this 6th day of March 2008

ORDERED

1. State Defendants' motion to dismiss is granted in part and denied in part;

2. Defendant Crosson's motion to disqualify plaintiffs' counsel is denied;

3. Defendant Crosson's motion to dismiss plaintiffs' state claims is denied; and

4. Plaintiffs' motion to strike and their request for reimbursement of attorney's fees is denied.